**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Cargill, Incorporated

               Movant,

    vs.

Public Joint Stock Company National Bank Trust

               Respondent.

23   Misc. _____

**MEMORANDUM OF LAW IN SUPPORT OF**
**CARGILL, INCORPORATED'S MOTION TO QUASH**

WEIL, GOTSHAL & MANGES LLP
Daniel L. Stein
Michael P. Heffernan
Joshua M. Glasser
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
daniel.stein@weil.com
michael.heffernan@weil.com
joshua.glasser@weil.com

*Counsel for Movant Cargill, Incorporated*

Dated: April 28, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................2

FACTUAL BACKGROUND ..................................................................................................3

ARGUMENT ........................................................................................................................6

I.    THE COURT SHOULD ALLOW CARGILL TO OBJECT TO THE
APPLICATION. ...................................................................................................6

      A.    Cargill Has Standing To Oppose The Application ....................................6

II.    THE APPLICATION SHOULD BE DENIED BECAUSE THE
REQUESTED DISCOVERY IS NOT "FOR USE" IN A FOREIGN
PROCEEDING ......................................................................................................7

      A.    NBT Has Not Demonstrated A "Practical Ability" To Introduce
The Requested Discovery in the BVI Courts .............................................8

      B.    NBT Has Not Shown That Any BVI Proceedings Are Within
Reasonable Contemplation ........................................................................9

      C.    The Alleged Facts Are Wildly Inaccurate .................................................12

III.    THE APPLICATION SHOULD BE DENIED BECAUSE THE
SUBPOENAS ARE UNDULY INTRUSIVE .......................................................16

CONCLUSION ....................................................................................................................18

## TABLE OF AUTHORITIES

**Cases**

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017)..............................................................................8

*Ayyash v. Crowe Horvath L.L.P.*,
   2018 WL 2976017 (S.D.N.Y. June 13, 2018) .......................................................11

*In re Devine*,
   2022 WL 1658586 (S.D.N.Y. May 25, 2022) ....................................................6, 7

*Fortis Bank (Nederland) N.V. v. Abu Dhabi Islamic Bank*,
   2010 WL 7326395 (N.Y. Sup. Ct. Aug. 25, 2010)....................................13, 14, 15

*In re Godfrey*,
   526 F. Supp. 2d 417 (S.D.N.Y. 2007)..................................................................7

*In re Hansainvest Hanseatische Investment- GmbH*,
   364 F. Supp. 3d 243 (S.D.N.Y. 2018)..................................................................9

*In re Harbour Victoria Inv. Holdings Ltd.*,
   2015 WL 4040420 (S.D.N.Y. June 29, 2015) .......................................2, 9, 17, 18

*In re Hornbeam Corp.*,
   2015 WL 13647606 (S.D.N.Y. Sept. 17, 2015), *aff'd*, 722 F. App'x 7 (2d Cir.
   2018) ..............................................................................................................7

*In re Kuwait Ports Auth.*,
   2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) ...................................................9, 11

*In re Letter Rogatory from Justice Ct. Dist. of Montreal*,
   523 F.2d 562 (6th Cir.1975) ..............................................................................6

*In re of Lucille Holdings Pte. Ltd.*,
   2022 WL 1421816 (D.D.C. May 5, 2022)............................................................11

*Mennen v. J.P. Morgan & Co.*,
   91 N.Y.2d 13 (1997) ........................................................................................15

*In re Okean B.V.*,
   60 F. Supp. 3d 419 (S.D.N.Y. 2014)..................................................................17

*In re Sargeant*,
   278 F. Supp. 3d 814 (S.D.N.Y. 2017)................................................................11

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
   376 F.3d 79 (2d Cir. 2004)................................................................................16

*UniCredit Bank AG v. Glencore Singapore Pte, Ltd.*,
   [2022] ................................................................................................................................15

**Statutes**

28 U.S.C. § 1782 ("§ 1782") ................................................................................... *passim*

**Other Authorities**

S. Rep. No. 1580 (1964) .............................................................................................2

Cargill, Incorporated and its affiliates ("Cargill"), respectfully submit this memorandum of law in support of its motion to quash the subpoenas issued by Public Joint Stock Company National Bank Trust (the "Applicant"), pursuant to this Court's *ex parte* Order of April 18, 2023 (the "Order") (Stein Decl. Ex. 1), granting the application for discovery filed by the Applicant on January 10, 2023 (the "Application").

The Application seeks access to a broad swath of Cargill's confidential and proprietary banking records, but lacks any reasonable justification for its request.[1] It is riddled with factual inaccuracies, specious logic, and baseless innuendo and fails to articulate how the highly sensitive information it seeks might be relevant to any viable claims that the Applicant might bring. The Applicant represented to the Court in its January filing that it would shortly bring claims against Cargill and a host of other parties. Nearly four months later the Applicant has yet to fulfill that promise because it has no valid claim, much less one that it could reasonably contemplate bringing in a court in the British Virgin Islands (BVI), where the Court lacks jurisdiction over the (poorly) articulated claim. Further, the Applicant is subject to sanctions in the BVI (being an entity owned or controlled by a designated, *i.e.*, sanctioned, person) arising out of the conflict in Ukraine, making it practically impossible for it to retain counsel needed to even file its claim. Nonetheless, despite these insurmountable obstacles to bringing a valid legal claim, the Applicant – a majority owned subsidiary of the Russian Central Bank – misleadingly suggests to this Court that a claim is imminent and on that basis seeks a wealth of confidential and proprietary banking records of

---

[1] Notably, the documents submitted to the Court are inconsistent in terms of the materials Applicant seeks. While the Application seeks only "orders, instructions or wire transfers" related to the "Conduit Companies" (Stein Decl. Ex. 2 at 1), the supporting Declaration of Neil Dooley seeks the same categories of documents, related to the "Traders." (Dooley Decl. ¶ 2). Ultimately, the Court has only granted Discovery as to the "Conduit Companies" (Stein Decl. Ex. 1).

dozens of Western companies, for no valid purpose: the requested discovery could in no way be said to be "for use" in a non-speculative foreign proceeding, as required. In short, the Application is an attempt to abuse this Court's authority under 28 U.S.C. § 1782 ("§ 1782") and should not be countenanced by this Court.

## PRELIMINARY STATEMENT

Used properly, § 1782, provides a vehicle for litigants to obtain discovery from U.S. residents "for use" in proceedings abroad. Congress intended § 1782 "to clarif[y] and liberalize[] existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the United States."[2] But that is not what this Applicant is seeking to do. Here, there is no proceeding pending in a foreign or international tribunal, nor is such a proceeding "within reasonable contemplation." Section 1782 is not an invitation for plenary, pre-suit discovery;[3] courts must ensure that the requested discovery is actually "for use" in a foreign proceeding, and not a pretext for obtaining discovery for litigations that Applicant plans to initiate in the United States, or a means to conduct a fishing expedition for some unstated, potentially nefarious purpose.[4] This is especially true here where the requested discovery will go to a Russian entity during a time of global conflict and strife. And while the relevant foreign proceedings need

---

[2] See S. Rep. No. 1580 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 3782, 3788.

[3] Pre-suit discovery is generally not available for parties in the United States. It would be perverse, indeed, if a foreign party – here, a bank owned by the Central Bank of Russia and controlled by the Russian state – could obtain the private banking records of a U.S. company by merely stating that it *intends* to file an action abroad without taking any concrete steps.

[4] *See e.g., In re Harbour Victoria Inv. Holdings Ltd.*, 2015 WL 4040420, at *8 (S.D.N.Y. June 29, 2015) (denying a § 1782 application in part because the applicant appeared to be engaged in a fishing expedition to identify other foreign venues in which to bring suit).

not be pending at the time of the application for § 1782 discovery, such proceedings must be "within reasonable contemplation." Applicant's say-so is not enough to meet that standard.

## **FACTUAL BACKGROUND**

The entire foundation of the Russian-law fraud claim that Applicant claimed it intends to file in the BVI rests on the unsupported say-so of Neil Dooley in the "Dooley Declaration." (Stein Decl. Ex. 4 ("Dooley Decl."). Neil Dooley is not some recognized expert in structured trade finance who can credibly impugn the structured trade finance trades at issue here as "fraudulent." Nor is Mr. Dooley an employee of Applicant or an alleged victim with credible firsthand knowledge of the facts. Rather, Mr. Dooley is simply an English solicitor and partner at the law firm of Steptoe & Johnson UK LLP, the British affiliate of Applicant's U.S. law firm, Steptoe & Johnson LLP, and he otherwise claims no relevant expertise. In fact, there is nothing whatsoever in his Declaration that establishes any basis to conclude that Mr. Dooley has any experience with commodities transactions or structured trade finance. Indeed, the substance of his Declaration – which is replete with errors, false assumptions, and fundamental misunderstandings – suggests he has no relevant experience. This entire hearsay declaration – and all the facts and theories undergirding the supposedly forthcoming BVI litigation – can be dismissed out of hand.

But even the facts as Mr. Dooley presents them show that Applicant has no case under Russian law, and certainly no case against Cargill that can be brought in the BVI. The foreign litigation that the Applicant said in January that it intended to file shortly, in Mr. Dooley's telling, seeks to recover for an alleged loss suffered by Rost Bank, a Russian bank that its former owner Mikhail Shishkhanov allegedly "loot[ed]" and which has since merged with NBT. (Dooley Decl. ¶¶ 7, 14). Cargill, for its part, did no business with Rost Bank and had no direct contact with Rost

3

Bank, and Applicant makes no allegation otherwise. In fact, Applicant plans to bring a case against Cargill based on an alleged fraud that is unrelated to either Cargill or the BVI.

Mr. Dooley begins his theory by speculating that there were no actual commodities trades, underlying the financial transactions in question, but his claim is just that – pure speculation. The very records that Dooley cites shows that there were commodities trades, notwithstanding Mr. Dooley's imagination to the contrary. Throughout his declaration, Mr. Dooley confuses contracts for the purchase and sale of goods with documents evidencing the delivery of physical goods (a bill of lading), when in fact there is no necessary connection between the two.

Building off these imaginary problems with the underlying commodities trades, Mr. Dooley then turns to a convoluted effort to link those trades to a loss suffered by an unrelated bank, which had nothing to do with these trades. In his declaration, Dooley asserts that, in June 2017, another Russian Bank owned by Shishkhanov, B&N Bank, loaned Rost Bank $75 million dollars. Rost Bank then transferred $74,568,693.00 to Digital Invest, another Russian entity, as consideration for bonds issued by a Cypriot company called Belyrian Holdings. Rost Bank repaid B&N Bank in full in March 2018, using a second loan it obtained from the Central Bank of Russia. (Dooley Decl. ¶ 51) Then, in Dooley's telling, the money that Rost Bank originally borrowed from B&N Bank passed through Cargill on its way back to B&N Bank as part of some fraudulent scheme, resulting in a loss to Rost Bank.

To complete the loop, and link the loss to commodities trades, Dooley's hypothesized "fraud" requires, as Dooley does, piecing together a complex daisy chain of transactions, none of which – viewed separately or together – relate in any way to any of the structured trade finance transactions that Cargill conducted with other parties. Thus, Applicant essentially (and erroneously) posits that it can hold Cargill responsible for a failed transaction with which it had

nothing to do, by linking it through a chain of seven unrelated wire transfers cherry-picked by Dooley for no other reason than the fact that they were similarly sized. Dooley traces a series of wire transfers beginning with Digital Invest, one of which involved a Cargill entity called Midwestern Trading Group (MTGI). (Dooley Decl. ¶ 51). But Dooley does not offer any evidence that the wires he tries to tie together are actually related in any way, let alone that any singular or group of wire transfers was improper, individually or collectively. Moreover, much of the evidence that Mr. Dooley does cite in support of its attenuated theory is inaccurate or false. Under Mr. Dooley's logic, any substantial participant in global trade could somehow be linked back to a loss suffered by Putin's Central Bank. That cannot be right.

Rather than address the missing Belyrian Holdings bonds that Rost Bank purchased, which appear to be the source of the actual loss – if any loss truly even exists – Applicant attempts to tie Cargill (and 13 other independent multi-national companies) to some kind of alleged scheme merely because Cargill performed a structured trade finance transaction with B&N Bank, another bank owned by Shishkhanov, at about the same time the wire transfers occurred. (Dooley Decl. ¶ 8).

In addition, the entities, loans, wires, and related activity Applicant describes are predominantly located in Russia and Cyprus, with only a tangential brush with the BVI (the allegations that Cargill entered into a loan with Diamond Forca Limited ("Diamond Forca," incorporated in the BVI), which means, as discussed in greater detail below, that the BVI is not a proper forum for these claims, even if a valid claim could be stated. Accordingly, Applicant's suggestion that it has a valid claim against Cargill, let alone one that it could reasonably contemplate bringing in the BVI, is fanciful at best.

Indeed, perhaps for that reason, among many other strong reasons (such as lack of standing), Applicant has taken no steps toward filing any claim in the BVI. Applicant has not hired BVI counsel. The only nexus to the BVI, Diamond Forca – is defunct, and Applicant has made no attempt to rehabilitate it. There is no proceeding currently pending in the BVI and, as far as Cargill can tell, there are no signs of any proceeding being initiated anytime soon.

Instead, on January 10, 2023, Applicant sought an *ex parte* order from this Court permitting the issuance of subpoenas pursuant to § 1782. On April 18, 2023, the Court granted the Application. This motion followed.

## <u>ARGUMENT</u>

## I. THE COURT SHOULD ALLOW CARGILL TO OBJECT TO THE APPLICATION.

As a preliminary matter, Cargill plainly has standing to object to the discovery authorized by the Order, even though Applicant has not stated that it intends to seek records directly from Cargill, because Cargill is one of the parties against whom the requested discovery is supposedly to be used.

### A. Cargill Has Standing To Oppose The Application

"[S]tanding to oppose subpoenas issued under § 1782 is [not] limited to the subpoenaed witness." *In re Devine*, 2022 WL 1658586, at *3 (S.D.N.Y. May 25, 2022) (alterations in original) (quoting *In re Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997)). Indeed, the "'ultimate targets of a § 1782 discovery order issued to third parties have standing to challenge the district court's power to issue a subpoena under the terms of an authorizing statute.'" *Id*. (citation omitted); *see also In re Letter Rogatory from Justice Ct. Dist. of Montreal*, 523 F.2d 562, 564 (6th Cir. 1975) (same). Courts within the Southern District of New York, thus, routinely find parties against whom the discovery is to be deployed in proceedings abroad have standing have standing to object. *See, e.g.*,

*In re Devine*, 2022 WL 1658586, at *3; *In re Hornbeam Corp.*, 2015 WL 13647606, at *2 (S.D.N.Y. Sept. 17, 2015), *aff'd*, 722 F. App'x 7 (2d Cir. 2018).

Here, NBT's memorandum of law in support of its Application discloses NBT's intent to pursue claims against "the Traders," defined to include Cargill. (Stein Decl. Ex. 3 at 2-3). Thus, as the party targeted by the requested discovery, Cargill has standing to object.

## II. THE APPLICATION SHOULD BE DENIED BECAUSE THE REQUESTED DISCOVERY IS NOT "FOR USE" IN A FOREIGN PROCEEDING

All parties agree, and this Court has already found, that to obtain discovery pursuant to § 1782, the applicant must establish the three statutory requirements: "(1) that the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) that the discovery is for use in proceeding before a foreign tribunal, and (3) that the application is made by a foreign or international tribunal or any 'interested person.'" (Stein Decl. Ex. 1 at 1-2) (quoting *In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *3 (S.D.N.Y. Jan. 16, 2020)). Indeed, the applicant has the "burden of proof" on all the statutory requirements. *In re Godfrey*, 526 F. Supp. 2d 417, 418 (S.D.N.Y. 2007); *see also In re Certain Funds, Accts., &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*, 2014 WL 3404955, at *6 (S.D.N.Y. July 9, 2014), *aff'd sub nom. Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015).

Here, Applicant's failure to satisfy the statutory "for use" requirement dooms the Application and ends the Court's inquiry for two independent reasons. *First*, the requested discovery cannot possibly be "for use" in the anticipated proceeding in the BVI because, as explained in accompanying affidavit of Oliver Clifton, a partner at Walkers Global who is based in the BVI and an expert in BVI law, BVI courts would have no jurisdiction over even the vaguely articulated claims that the Applicant says it intends to file. Therefore, there is no "practical ability

to inject the requested information into a foreign proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017); *see also KPMG L.L.P.*, 798 F.3d at 123. *Second*, even if such a proceeding were possible (and, to be sure, it is not), in order to meet the "for use" requirement, NBT must show that the proceeding is nonetheless within "reasonable contemplation." But NBT has not made any effort to demonstrate reasonable contemplation. It has taken no steps toward filing a proceeding, such as hiring counsel. And that is for good reason: as explained in the accompanying Clifton Declaration, NBT, which is ultimately owned and controlled by the Russian state, is severely limited in its ability to engage BVI counsel in the BVI, (without which NBT cannot litigate in the BVI court that would have jurisdiction over the its claims), foreclosing the possibility of any such proceedings being considered "within reasonable contemplation," as required.

A. **NBT Has Not Demonstrated A "Practical Ability" To Introduce The Requested Discovery in the BVI Courts**

At a minimum, for the sought-after discovery to be "for use" in a foreign proceeding, the § 1782 applicant must "establish that he or she has the practical ability to inject the requested information into a foreign proceeding." *In re Accent Delight*, 869 F.3d at 132. But, as a matter of logic, there is no "practical ability" to introduce evidence into a proceeding that cannot exist in the first place, including due to lack of jurisdiction. As demonstrated in the Clifton Declaration, the BVI Courts have no personal jurisdiction over Cargill. (Clifton Decl. ¶¶ 9, 10, 11, 12) Diamond Forca has been liquidated and dissolved. While proceedings can still be brought against it as a matter of BVI corporate law, the company is, as a dissolved entity, unable to defend or participate in any proceedings. (Clifton Decl. ¶¶ 17, 18) There would thus be no real issue as between the Applicant and Diamond Forca for the BVI Court to try. Absent that real issue, Diamond Forca's former registration in the BVI does not create a sufficient connection to the BVI to order

8

extraterritorial service on Cargill to participate in such proceedings. (Clifton Decl. ¶¶ 25, 26) Moreover, Applicant lacks any alternative gateway to seek such an order as there is no nexus between the claims and BVI: Applicant neither alleges any wrong committed nor damage sustained in the BVI. (Clifton Decl. ¶ 20) In any event, BVI is not clearly or distinctly the appropriate forum for the trial of the Applicant's claims, which are said to arise under Russian law and concern allegations of wrongdoing which occurred exclusively outside of the BVI.

### B.   NBT Has Not Shown That Any BVI Proceedings Are Within Reasonable Contemplation

While there is no requirement that the foreign proceeding be "pending" or "imminent" in order for the requested discovery to be "for use" in such proceeding, the Supreme Court held in *Intel Corp. v. Advanced Micro Devices, Inc.* that § 1782 nonetheless requires "that a dispositive ruling . . . be within reasonable contemplation." 542 U.S. 241, 259 (2004). And, unfortunately for NBT, the "reasonable contemplation" standard does not "sanction the use of nonexistent, purely hypothetical proceedings to satisfy § 1782's requirements." *In re Harbour Victoria*, 2015 WL 4040420, at *8. Indeed, the Second Circuit has held that "the applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated . . . the proceedings cannot be merely speculative." *Id*. at 123-24; *see also KPMG L.L.P.*, 798 F.3d at 123.

Applicant proffers none of the requisite objective indicia to support a finding that the foreign proceeding that Applicant says it intends to bring is actually within reasonable contemplation, including, by way of example, hiring local counsel, retaining experts, stating a definitive time frame in which a suit will be filed, and preparing pleadings and filings. *See, e.g.*, *In re Kuwait Ports Auth.*, 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021); *In re Hansainvest Hanseatische Investment- GmbH*, 364 F. Supp. 3d 243, 249-50 (S.D.N.Y. 2018). In fact, NBT fails

to demonstrate *any* affirmative step it has taken to prepare to file litigation in BVI beyond this 1782 application.

As highlighted in the Clifton Declaration, a recent search of the publicly available records failed to uncover any evidence that the Applicant had filed BVI proceedings. (Clifton Decl. ¶ 5) And, to be sure, even if NBT did hire counsel for that purpose, the Second Circuit has stated that hiring counsel and discussing claims alone is insufficient to establish "an objective showing" of "reasonable contemplation." *KPMG, L.L.P.*, 798 F.3d at 124.

Here, there is an obvious explanation for why no such evidence exists: as demonstrated in the Clifton Declaration, it will be difficult if not practically impossible for the Applicant to engage BVI counsel. As of April 2023, a sanctioned entity (or the subsidiary of a sanctioned entity, such as the Applicant) can only retain counsel in the BVI in reliance on a general license which can be granted for a period of six months only. (Clifton Decl. ¶ 28) Any BVI counsel will be subject to strict and material limits on the fees it can charge to a client subject to sanctions, and the counsel will be subject to local reporting requirements. (*Id*) BVI counsel would be reasonably expected to observe these limits in respect of the Applicant, even without the Applicant itself being a "designated entity," by virtue of its ultimate ownership by the Russian state. In addition, if the Applicant seeks to retain BVI counsel to pursue its claims then it will face significant practical hurdles. Any BVI counsel accepting instructions from the Petitioner would face significant reputational cost by representing a Russian client which is subject to sanction in the current political climate, particularly in the BVI. (Clifton Decl. ¶ 31) Further, notwithstanding the effect of the general license, it has become effectively impossible for funds to flow from Russian entities, or on behalf of Russian entities, to law firms in the BVI, even where sanctions do not specifically prohibit the transaction. (Clifton Decl. ¶ 30) The banks and intermediary banks which would be

required to process the transaction cannot reasonably be expected to bear their own reputational

risk of wiring funds on behalf of Russian entities and especially sanctioned Russian entities, even

if ultimate receipt of the funds is permitted under the general license. Ongoing payments to BVI

Counsel would foreseeably need to be made outside the international banking system, which apart

from presenting substantial logistical difficulties, would present a near insurmountable regulatory

and reputational risk for BVI Counsel.

 Moreover, by NBT's own admission, the foreign proceeding is impermissibly speculative:

NBT concedes that it is still in the process of considering whether to even bring a claim as it stated

it intends to use the subpoenaed documents "to identify the scope of the Scheme as well as potential

other participants." (Stein Decl. Ex. 3 at 8). That is plainly an improper use of § 1782. "[F]acts

indicating that at the time the application was filed, the discovery was sought to determine whether

litigation could or should be pursued are insufficient to meet the 'reasonable contemplation'

standard." *In re of Lucille Holdings Pte. Ltd.*, 2022 WL 1421816, at *13 (D.D.C. May 5, 2022)

(citing *Ayyash v. Crowe Horvath L.L.P.*, 2018 WL 2976017, at *3 (S.D.N.Y. June 13, 2018)).[5]

 NBT's impermissible use of § 1782 is further confirmed by the fact that, despite the passage

of over four months since it professed its intent to bring litigation in the BVI, it has not filed suit

or even taken any preparatory actions towards filing such a suit. While failure to initiate the

proceeding is not fatal to a § 1782 application, the passage of so much time without any proactive

---

[5] That Applicant is not even sure which documents it is seeking, *see supra* note 1, further confirms that it is seeking to use this Application to determine which claims to bring. *See e.g., In re Sargeant*, 278 F. Supp. 3d 814, 823 (S.D.N.Y. 2017) *See also In re Kuwait Ports Auth*., 2021 WL 5909999, at *8 (noting that an application seeking to "rely upon the requested discovery 'to assess whether to initiate actions,'" would be "plainly insufficient") (citing *In re Sargeant*, 278 F. Supp. 3d at 823-24); *In re Certain Funds Accts., and/or Inv. Vehicles Managed by Affiliates of Fortress Grp., LLC*, 2014 WL 3404955, at *6 ("Courts must embrace Congress's desire that broad discovery be available for parties . . . while also guarding against the potential that parties may use § 1782 to investigate whether litigation is possible in the first place[.]").

steps taken by the Applicant aside from submitting the Application suggests that the Application is really just an impermissible fishing expedition (which, for the reasons outlined below, this Court should not indulge) and that NBT never actually intends to file in BVI because it knows it does not have a viable claim.

### C.  The Alleged Facts Are Wildly Inaccurate

Finally, NBT's application is premised on, at best, a misunderstanding of the structured trade finance transactions at issue. None of the allegations in NBT's Application are true, and in fact, are misrepresentations that border on Rule 11 misconduct. Accordingly, the proceedings cannot be fairly said to be "reasonably contemplated." Although the Court need not consider the merits of the arguments that Applicant plans to raise in a foreign proceeding to decide the present matter, it is worth noting again that Applicant has not actually presented any facts about trade finance, but only the opinions of its own English Solicitor. The very foundation of the Applicant's argument rests – in large part – on its description of what constitutes a "legitimate" trade finance transaction and the premise that any type of trade finance transaction resulting in anything other than the actual delivery of goods is illegitimate and indicia of fraud. (Dooley Decl. ¶¶ 15, 30). Although these bald assertions are presented as fact, Applicant cites no authority whatsoever and simply counts on the Court to rely on its word.

Stripped of all of the supposition, misrepresentations, unsupported statements of belief, and innuendo, the transactions described in the Dooley Declaration are legitimate structured trade finance transactions that Cargill (and multiple other companies) conducted with its then-customer, B&N Bank ("B&N"). As set forth in that Declaration, the transactions involved (1) a letter of credit issued by B&N in 2016, on the application of a purchaser of commodities (MTGI), for the benefit of a seller of commodities (Cargill Financial Solutions ("CFS")) (Dooley Decl. ¶ 30-34); and (2)

the discounting of that letter of credit by the issuer (B&N) in exchange for an immediate payment to the seller (CFS) (Dooley Decl. ¶ 36). Despite Applicant's characterizations, discounted letters of credit, such as the ones described here, are not uncommon in international commodities markets, and Courts have acknowledged that they serve a legitimate purpose. *See, e.g.*, *Fortis Bank (Nederland) N.V. v. Abu Dhabi Islamic Bank*, 2010 WL 7326395, at *9 (N.Y. Sup. Ct. Aug. 25, 2010). In such a scenario, the buyer (MTGI) would typically have an obligation to repay the issuer (B&N) upon maturity of the letter of credit and, indeed, that is precisely what the letter of credit issued here required. Here, however, the buyer/applicant (MTGI) and the issuer (B&N Bank) agreed to settle that obligation upon maturity through an additional financial transaction. Specifically, MTGI loaned money to Diamond Forca, a party under B&N's administrative control, and assigned its right to collect on that loan to B&N in full satisfaction of its repayment obligations under the letter of credit. (Dooley Decl. ¶¶ 37-44). Cargill and B&N explicitly linked the two transactions through transparent cross-references.[6] The transaction then proceeded as the parties intended, all payments were made as required, and no party suffered any loss.

In September 2017, B&N went into rehabilitation. (Dooley Decl. ¶ 8). As part of that rehabilitation process, it merged with another bank, Rost Bank, the assets of which were ultimately acquired by the Applicant here. Applicant is, as a result, "majority owned by the Central Bank of Russia," a sanctioned entity. (Dooley Decl. ¶¶ 4-9). Now, the Applicant, posits that Rost Bank has a claim against Cargill, because of these transactions that Cargill conducted with a different bank, all of which were paid in full as agreed by the parties.

---

[6] NBT successfully identified all of the references to the ICA that exist in the loan documents to include the similar titles of the documents, and the condition precedent in the loan requiring Cargill FS to receive funds pursuant to the ICA. This suggests the link between the transactions was at least clear to NBT upon reading the documents. (Stein Decl. Ex. 4 ¶¶ 40-43). It is unclear why NBT believes it would not be equally apparent to Binbank's auditors. (Stein Decl. Ex. 4. ¶ 48).

To make this fanciful accusation, the Applicant again advances the unsupported beliefs and suppositions of an English Solicitor, but no actual facts. Most fundamentally, the Applicant states that it "*believes* that there were no commodities trades" underlying the letter of credit issued by B&N (Dooley Decl. ¶ 13) (emphasis added). The belief is based on observations that the transactions were between "related companies, the purported parties to the trades not appearing on bills of lading, unexplained inconsistencies in shipment sizes, and lack of confirmation that goods were ever actually exchanged." (Dooley Decl. ¶ 13). Applicant presents these observations as factual proof that the commodities trades did not exist, but never refers to an actual authority that might lead to such a preposterous conclusion. Odder still, despite its assertion that the trades never happened, Applicant acknowledges that under the letter of credit, CFS was required to present copies of an invoice, a bill of lading, and a signed statement that original shipping documents were delivered from shipper to consignee and that the goods would be discharged outside of Russia. They then readily admit that CFS diligently presented those documents to B&N Bank as LC issuer (Dooley Decl. ¶ 34). Accordingly, Applicant recognizes – but still ignores – the fact that a record documenting the transaction's legitimacy actually exists.

Experienced participants in international commodities trades routinely buy and sell goods on the high seas without any expectation that the goods will be delivered. These trades are commonly done for financial, rather than commercial purposes. *See, e.g.*, *Fortis Bank*, 2010 WL 7326395, at *9. That the commodities trades at issue here were made for financial purposes does not mean that there were no commodities shipments. The Supply Agreement at issue here involved a genuine purchase and sale, with legitimate rights and obligations on the buyer and seller, even if no physical commodities were delivered between them. As one tribunal with substantial experience in international commodities trades has observed, "goods may be resold (possibly more

than once) with physical delivery only going to the ultimate buyer." *UniCredit Bank AG v. Glencore Singapore Pte, Ltd.*, [2022] SGHC 263 (Sing.), ¶ 46 (hereinafter "*UniCredit*") (citing *Garnac Grain Co. Inc. v. HMF Faure & Fairclough Ltd* [1966] 1 QB 650 (Eng.)). [7] As a result, "[t]rading in [commodities] frequently involves what amounts to little more than trading in documents with the product delivered to the ultimate purchaser, with money and documents being exchanged by the intervening participants in the chain from original supplier to the ultimate purchaser. That does not make the [intervening] transactions any less genuine or mean that [title] in the goods does not pass." *UniCredit* at ¶ 66 (quoting *Credit Agricole Corp. & Inv. Bank v. PPT Energy Trading Co. Ltd.* [2022] SGHC(I) 1) (Sing.)*; see also Mennen v. J.P. Morgan & Co*., 91 N.Y.2d 13, 20 (1997) (finding that the Independent Contracts "principle stands for the fundamental proposition . . . that all parties [to a letter of credit transaction] deal in documents rather than with the facts the documents purport to reflect") (citations omitted) (cleaned up).

Applicant's entire theory of the case rests upon this glaring false premise. Moreover, that the commodities transactions at issue here had this financial purpose does not mean that they were illegitimate transactions. *See UniCredit* at ¶ 30 ("Financing as a motive does not render the transaction a sham if there was an intention to create legal relations in connection with genuine cargo."). New York law draws no distinction between using letters of credit for a structured finance transaction and using them to facilitate a physical shipment of goods, so long as all of the parties to the transaction are aware of its purpose and partake in a legitimate transaction, as was plainly the case here. *See Fortis Bank*, 2010 WL 7326395, at *11.

---

[7] Available at https://www.elitigation.sg/gd/s/2022_SGHC_263.

### III.   THE APPLICATION SHOULD BE DENIED BECAUSE THE SUBPOENAS ARE UNDULY INTRUSIVE

Even if an applicant satisfies the statutory requirements of § 1782, "a district court is not required to grant § 1782(a) discovery application simply because it has the authority to do so." *Intel*, 542 U.S. at 264. The Intel court "emphasized" that, once the statutory requirements are satisfied, the Court should still weigh four discretionary factors—(1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance," (3) "whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," and (4) whether the "requests are unduly intrusive or burdensome." *Id*. The Court should deny Applicant's application in its discretion because of the overly intrusive nature of the subpoenas, particularly in light of the lack of probative value the discovery will have on the alleged proceeding, and the discovery's inability to cure the deficiencies in Applicant's application discussed above.[8]

NBT has served seven subpoenas on New York banks seeking "copies of any and all orders, instructions, or wire transfers, where the paying or receiving party was [one of the eight identified Conduit Companies] in an amount equal to or exceeding $50,000 where [the bank] acted as either the direct transfer bank or as the intermediary or correspondent bank, from June 1, 2013, to September 30, 2017." (*See e.g.*, Stein Decl. Ex. 25). These are highly proprietary financial records

---

[8] While courts have sometimes found it possible to alleviate concerns as to a subpoena's scope by tailoring the requests more narrowly, courts have also exercised their discretion in determining that doing so is either not possible in a given case or cannot "effectively eliminate[] the concerns" of the opposing party. *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004).

of multiple US companies, all of which will ultimately be destined for Russia. This request is unimaginably intrusive because it represents a blatant attempt by an entity that is demonstrably controlled by Russia's Central Bank to obtain records from Western businesses under the guise of a foreign proceeding the Applicant has no ability, or intent, to ever bring for purposes that are entirely unknown.

Indeed, courts have denied § 1782 applications altogether where the probative value of the documents does not justify the burden on the responding party. *See e.g., In re Okean B.V.*, 60 F. Supp. 3d 419, 428 (S.D.N.Y. 2014) (denying a § 1782 application where, after conducting an in-camera review, the Court determined the "limited probative value" of the documents did not justify the burden of the subpoena). The extensive scope and invasive nature of NBT's request should be considered in light of the non-existent probative value of the documents it will receive. NBT cites a string of cases in which courts have granted § 1782 applications seeking "routinely produced" documents such as bank statements. (*See* Stein Decl. Ex. 3 at 13.) Even so, these "routine" documents cannot be of any service to NBT for the reason Cargill has already discussed: NBT cannot bring the claims identified in its application in a BVI proceeding.

Additionally, even if NBT could establish that the records it seeks are probative of its allegations — which it cannot — the requests are clearly an attempt by Applicant to engage in a "fishing expedition." *See e.g., In re Harbour Victoria Inv.*, 2015 WL 4040420, at *9 (denying a § 1782 application in part because the applicant appeared to be engaged in a fishing expedition to identify other foreign venues in which to bring suit). The breadth of NBT's requests — particularly in light of their lack of even potential probative value — indicates that it is abusing § 1782 by engaging in a fishing expedition in hopes of identifying additional claims or parties for a future proceeding. By its own admission, NBT will attempt to use the subpoenaed documents "to identify

17

the scope of the Scheme as well as potential other participants." (Stein Decl. Ex. 3 at 8). Not only is this impermissible for the reasons discussed with respect to the "for use" statutory requirement, *see supra* at 9, the Court has considered whether the Application constitutes a fishing expedition in exercising its discretion to deny § 1782 applications. *See In re Harbour Victoria Inv.*, 2015 WL 4040420, at *7 ("[C]oncern for abuse of the § 1782 petition, as in the form of a fishing expedition . . . is equally relevant to the exercise of its discretion."). Section 1782's purpose is to permit relevant discovery in reasonably contemplated foreign proceedings. NBT, however, seeks to pervert that valid purpose by using § 1782 as a means to peruse a complete list of Cargill's counterparties, business partners, and clients – entities that are wholly unrelated to the fraud it alleges – in the hopes of finding additional targets for its aspirational, futile litigation.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should recognize Cargill's standing to be heard in opposition to the Application and quash the Subpoena. Cargill has demonstrated that Applicant faces potentially insurmountable hurdles to showing that their requested Discovery is "for use" in any foreign proceeding. In the alternative, at a minimum, the Court should deny the application without prejudice affording the Applicant the opportunity to refile if and when they satisfy the Court that proceedings are reasonably contemplated.

Dated: April 28, 2023

/s/ Daniel L. Stein
Daniel L. Stein
Michael P. Heffernan
Joshua M. Glasser
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
daniel.stein@weil.com
michael.heffernan@weil.com
joshua.glasser@weil.com

*Counsel for Movant Cargill, Incorporated*