UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re PUBLIC JOINT STOCK COMPANY
NATIONAL BANK TRUST SECTION 1782
ACTION

**ORDER**

23 Misc. 134 (PGG)
23 Misc. 6 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On January 10, 2023, Petitioner Public Joint-Stock Company National Bank Trust

("National Bank Trust") filed an ex parte petition pursuant to 28 U.S.C. § 1782 for discovery in

aid of anticipated court proceedings in the British Virgin Islands.  In Re Ex Parte Application,

Under 28 U.S.C. § 1782, of Public Joint-Stock Co. Nat. Bank Trust, 23 Misc. 6 (PGG).

Petitioner sought subpoenas directing Respondents Deutsche Bank Trust Company Americas,

Bank of New York Mellon, Standard Chartered Bank, UBS AG, Societe Generale USA, JP

Morgan Chase Bank NA, and Citibank NA (collectively, the "Respondent Banks") to produce

documents for use in the British Virgin Islands.  (23 Misc. 6 (Dkt. No. 1))  This Court granted

Petitioner's application in an April 18, 2023 order.  (23 Misc. 6 (Dkt. No. 11))

In this consolidated action, Cargill, Inc. and proposed intervenors Louis Dreyfus

Company Suisse SA, Louis Dreyfus Company Asia PTE Ltd., and Louis Dreyfus Company

Trading & Service Co. SA (collectively, the "Dreyfus Entities") seek to quash the subpoenas

issued pursuant to this Court's April 18, 2023 order.[1]  (Cargill Mot. (Dkt. No. 1); Dreyfus Mot.

---

[1]  While Cargill and the Dreyfus Entities are not the targets of the subpoenas authorized pursuant
to this Court's April 18, 2023 order, they contend that they have standing to challenge the
subpoenas because National Bank Trust intends to use the requested discovery against them in a
British Virgin Islands court proceeding.  (See Cargill Br. (Dkt. No. 2) at 10-11; Dreyfus Br. (Dkt.
No. 35) at 14-18)

Unless otherwise indicated, docket references are to the docket in 23 Misc. 134.  All references
to page numbers correspond to the page numbers designated by this District's Electronic Case
Files ("ECF") system.

(Dkt. No. 34)) The Dreyfus Entities also seek to stay compliance with the subpoenas pending resolution of their motion to quash. (See Dreyfus Br. (Dkt. No. 35) at 17-18) Finally, both Cargill and the Dreyfus Entities seek an order staying discovery pending a ruling in the British Virgin Islands confirming that its courts have jurisdiction over the proceeding initiated by National Bank Trust. (See Cargill Reply (Dkt. No. 19) at 6-8; Dreyfus Reply (Dkt. No. 39) at 5-7)

For the reasons stated below, the Dreyfus Entities' motion to intervene will be granted, and Cargill and the Dreyfus Entities' motions to (1) quash and (2) stay discovery will be denied.

## **BACKGROUND**

### I.    **THE UNDERLYING DISPUTE**

Petitioner National Bank Trust is a Russian bank. Its Section 1782 application is supported by a January 6, 2023 declaration from Neil Dooley, who is a Steptoe & Johnson LLP attorney representing National Bank Trust. (23 Misc. 6, Dooley Decl. (Dkt. No. 3) ¶ 1)

According to Dooley, in August 2017, National Bank Trust was owned by Bank Otkritie, another Russian bank. (Id. ¶ 5) On August 29, 2017, "due to acute financial problems, Bank Otkritie was placed into administration by the Central Bank of Russia, and Bank Otkritie ultimately required an $8 billion bailout." (Id. ¶ 5) "As a result of the rehabilitation process, both [National Bank Trust] and Bank Otkritie were taken over by the [Central Bank of Russia]." (Id. ¶ 6) As of early 2023, National Bank Trust and Bank Otkritie are "under separate management." (Id. ¶ 6) According to Dooley, "[m]any of the bad and distressed assets of Bank Otkritie were transferred to [National Bank Trust]," which "is now in run-off in Russia." (Id.)

On September 21, 2017, Rost Bank and B&N banks – two Russian banks "owned and controlled" by Russian businessman Mikail Shishkhanov – also "went into rehabilitation."[2] (Id. ¶¶ 7-8)  At a date not specified in the Dooley declaration, B&N Bank was merged into Bank Otkritie, and, on July 2, 2018, Rost Bank was merged into National Bank Trust.[3]  (Id.)

Dooley alleges that between June 1, 2013 and September 30, 2017, certain "international commodities trading" companies – entities that Dooley refers to as "Traders" – and "Conduit Companies" – entities "owned and controlled by [] Shishkhanov" and all, save one, "incorporated in [the British Virgin Islands]" – "engaged in an unlawful scheme (the 'Scheme') intended to give the impression that [B&N Bank] was involved in profitable arms' length arrangements with the Traders to finance commodities trades." (Id. ¶¶ 2, 10-12)  Dooley further alleges that "th[is] Scheme enabled Mr. Shishkhanov and his controlled Conduit Companies to surreptitiously loot Rost Bank before its collapse." (Id. ¶ 14)

According to Dooley,

> [i]n a legitimate trade finance agreement, the buyer pays for goods by having a bank advance funds to the seller. The buyer, in turn, becomes obliged to repay the bank once (or shortly after) the goods are delivered to it. The buyer's obligation to repay the bank is often secured by a "standby letter of credit," i.e., a de facto guarantee from another bank. The commercial rationale for a bank in a trade finance transaction is to earn fees and interest charges. For the seller, trade finance provides a means to secure payment, and to do so sooner than it might otherwise be paid for the goods, albeit at a discount.

(Id. ¶ 15)

---

[2]  Although the Dooley declaration does not explain what "went into rehabilitation" means, the Court understands that the banks entered into a process to address insolvency.

[3]  Dooley states that, "as of the date of this declaration, the Petitioner [National Bank Trust] is not a designated entity," "Bank Otkritie is currently a designated entity," and "the [Central Bank of Russia] is subject to limited sanctions concerning dealings in Russian sovereign debt and securities, but those sanctions do not extend to its ownership of [National Bank Trust]." (23 Misc. 6, Dooley Decl. (Dkt. No. 3) ¶ 9)

3

Dooley alleges, however, that "there were no commodities trade[d]" in connection with the 2013-2017 B&N Bank trade finance agreements. (Id. ¶ 13) Instead of financing an exchange of goods, these agreements facilitated "transactions between related companies" in which "[t]he purported parties to the trades [did] not appear[] on bills of lading, [there were] unexplained inconsistencies in shipment sizes, and [there was a] lack of confirmation that goods were ever actually exchanged." (Id.)

According to Dooley, the B&N trade finance agreements were the first step in "a series of convoluted transactions" comprising the alleged scheme. (Id. ¶ 16) Dooley explains that, "[i]n the first part of the Scheme, [B&N Bank] entered an import credit agreement" like those described above "with a Trader unaffiliated with [B&N Bank] or [] Shishkhanov." (Id. ¶ 17) Because B&N Bank and the commodities trading company had no apparent affiliation, the "transaction[s] [were] not subject to the limits on funds that a Russian bank can provide to affiliated or connected entities," nor was B&N – under Russian banking regulations – required to maintain reserves equal to the full amount of the loans, as is required for loans to related parties. (Id. ¶ 17)

"Parallel to this transaction" – in which a commodities trading company would enter into an import credit agreement with B&N Bank – "the [trading company] entered into a separate loan agreement for a slightly smaller amount with a Conduit Company . . . under the control of [] Shishkhanov." (Id. ¶ 18) "Many of these loan agreements called for loan proceeds to be disbursed into [accounts held at] an Armenian bank and transferred via [] intermediary banks," including the Respondent Banks listed above. (Id. ¶¶ 18, 39, 47, 48) According to Dooley, "Armenia has very close ties to Russia," and "banks in Armenia are often used as transit accounts by Russian entities." (Id. ¶ 19)

4

Dooley explains that the loan agreements between the trading companies and the Conduit Companies typically contained two conditions precedent. (Id. ¶ 20) "First, funds from the original import credit agreement had to be transmitted to the seller [trading company]." (Id.) "Second, [B&N Bank] was to waive its rights under the original import credit agreement and respective security arrangements." (Id. ¶ 20)

According to Dooley, "[t]hese conditions precedent confirm that [the loan agreements]" between the trading companies and the Conduit Companies were "back-to-back arrangement[s]" with the import credit agreements between the trading companies and B&N Bank. (Id.) Finally, "[t]o complete the loop, [B&N Bank] and the purchaser [trading company] entered into an assignment agreement, in which [B&N Bank] released [the trading company] from obligations under the original import credit agreement in exchange for [the trading company's] commitment to transfer to [B&N Bank] all funds it would receive from the Conduit Company." (Id. ¶ 21)

During the alleged scheme Dooley describes, B&N Bank also provided loans to Rost Bank. (Id. ¶ 24-25) "[A]fter receiving an interbank loan from [B&N Bank], Rost lent funds to another entity affiliated with [] Shishkhanov." (Id. ¶ 25) These proceeds were then "funneled to the Conduit Company to [] repay the purchaser [trading company]." (Id.) In accordance with the assignment agreements described above, the funds were then ultimately funneled to B&N, to reimburse the bank for its loan to the commodities trading company. (Id.) And while Rost Bank repaid the loans it had received from B&N Bank, it "was never itself repaid" by the Shishkhanov-related entity to which it had made loans. (Id. ¶ 52) Accordingly, although Rost Bank "essentially compensat[ed] [B&N Bank] for the underlying fraudulent agreements," the loans to Rost Bank were never repaid. (Id. ¶ 24-25)

> According to Dooley, as a result of these transactions, B&N Bank became fully exposed to the risk of a loan to an affiliated, offshore entity (the Conduit Company) without holding the required reserves or reporting the risk in its accounts or regulatory filings.
>
> The [commodities trading companies] also benefited. [They] received the difference between the financing from [B&N Bank] and the loan amount transferred to the Conduit Company, without assuming any risk.

(Id. ¶¶ 22-23) Dooley further alleges that the commodities trading companies were either "aware of the fraudulent nature of the import credit agreements, or . . . turned a blind eye." (Id. ¶ 29) But Rost Bank – which "essentially compensated [B&N Bank] for the underlying fraudulent agreements" – was "left holding the proverbial bag." (Id. ¶ 24)

Dooley illustrates the losses Rost Bank suffered by "describ[ing] in detail" one "import credit agreement[] believed to be fraudulent." (Id. ¶¶ 28-29) Per Dooley's account, U.S.-based trading companies Cargill Financial Solutions ("Cargill Financial") and Midwestern Trading Group ("Midwestern") entered into a supply agreement, whereby "Cargill [Financial] (as seller) agreed to supply Midwestern (as purchaser) 34,982,784 metric tonnes of [Latvian oil] and 100,099,994 metric tonnes of [Russian oil]" in exchange for $44,646,083.41.[4] (Id. ¶ 31) Midwestern purportedly financed this shipment through a trade finance agreement with B&N Bank that "made available a line of credit for up to $44,646,083.41 for the benefit of Cargill

---

[4] Dooley describes inconsistencies in shipping records that suggest "that the underlying shipments did not take place." (23 Misc. 6, Dooley Decl. (Dkt. No. 3) ¶ 32) These purported inconsistencies include, for example: the fact that "[t]he sales arrangement [was] between two related parties" – as both Cargill Financial and Midwestern are "part of the Cargill Group with headquarters at the same address"; that "[t]he parties listed on the bills of lading are not parties to the supply agreement"; and that National Bank Trust "has located no record of the actual delivery of the goods." (Id.)

[Financial]." (Id. ¶¶ 34, 36)[5]  At the same time, "Midwestern entered into a loan agreement . . . with Diamond Forca Limited ('Diamond'), a BVI-incorporated Conduit Company believed to be affiliated with [] Shishkhanov"; per this agreement, Midwestern loaned Diamond $42,907,409.15."[6]  (Id. ¶¶ 34, 36, 37)  Then, "[t]o close out the Cargill side of the transaction . . . [B&N Bank] and Midwestern executed an assignment agreement by which Midwestern's rights under the Diamond Loan were assigned to [B&N Bank]." (Id. ¶ 44)

Dooley alleges that Rost Bank's loss stemmed from "[t]he next part of the [s]cheme," which "enabled Diamond's repayment" through "a series of linked transactions." (Id. ¶¶ 50-51)  As Dooley explains, first, B&N Bank "transferred to Rost RUB 4,650,000,000 (about $75 million) by way of interbank loan," which Rost repaid "with funds received from [the Central Bank of Russia]" for "insolvency prevention." (Id. ¶ 51)  Then, "Rost transferred to Digital Invest (a company affiliated with [] Shishkhanov) $74,568,693 as consideration for . . . bonds issued by Belyrian Holdings Limited," an entity controlled by a Shishkhanov affiliate. (Id.)  After a series of transfers between entities controlled by Shishkhanov and/or his associates, these funds were eventually transferred back to Diamond. (Id.)  "Diamond repaid to Midwestern $44,869,313.82 under the Diamond Loan"; the following day, "Midwestern transferred to [B&N Bank] $44,869,313.82" – the amount owed under the initial trade finance agreement – "thereby completing the transaction." (Id.)  Through this series of transactions,

---

[5]  Cargill Financial ultimately received $43,658,288 "because [it] agreed to apply a discount in exchange for immediate receipt of funds." (Id. ¶ 36)

[6]  According to Dooley, "neither Cargill [Financial] nor Midwestern had any risk in the transactions despite each receiving substantial benefits.  Cargill [Financial] received $43,658,288 from [B&N Bank] and transferred to Diamond only $42,907,409.15.  This amounts to $750,869.68 in profit." (Id. ¶ 45)

7

"Rost ultimately both repaid the interbank loan from [B&N Bank] and also paid the underlying debt[] but was never itself repaid." (Id.)

National Bank Trust asserts that the twelve companies listed below served as the conduits for the allegedly fraudulent transactions:

| Name | Place of Incorporation | Company number | Current status | Date of Incorporation |
|------|------------------------|----------------|----------------|------------------------|
| Crambe Asset Holdings Corp | British Virgin Islands | 1417216 | Liquidated on 22 December 2016 | 06 July 2007 |
| Olyserve Inc | British Virgin Islands | 1876069 | Liquidated on 15 June 2020 | 29 May 2015 |
| Rabalo Limited | British Virgin Islands | 1795772 | Liquidated on 19 December 2017 | 23 October 2013 |
| Reachway Overseas Ltd | British Virgin Islands | 1778845 | Liquidated on 1 March 2017 | 18 June 2013 |
| Ifchor SA (previously called Hansberg Finance Ltd) | British Virgin Islands | 1533733 | Liquidated on 5 December 2016 | 2 June 2009 |
| Frowell Holdings Ltd | British Virgin Islands | 1540373 | Liquidated on 13 April 2018 | 16 July 2009 |
| Garland Solutions Ltd | British Virgin Islands | 1874712 | Liquidated on 20 April 2018 | 20 May 2015 |
| Diamond Forca Ltd | British Virgin Islands | 1870263 | Liquidated on 30 May 2018 | 16 April 2015 |
| Darman Finance Limited | British Virgin Islands | 1508311 | Liquidated on 2 November 2018 | 24 October 2008 |
| Blanche Union Ltd | British Virgin Islands | 1876095 | Liquidated on 18 June 2018 | 29 May 2015 |
| Dana Overseas Ltd[3] | British Virgin Islands | 1803345 | Liquidated on 30 March 2020 | 17 December 2013 |
| Anerson Holdings Limited | Cyprus | HE268772 | Dissolved on 16 May 2018 | 11 June 2010 |

(Id. at 17)

National Bank Trust further asserts that the following twenty-five commodities trading companies also participated in the alleged scheme:

8

| Trading companies | Jurisdiction | Registration number | Addresses |
|---|---|---|---|
| Credit and Trading Company Ltd | United Kingdom | 06458824 | Room 13, 65 London Wall, London EC2M 5TU |
| Bunge SA | Switzerland | CH-020.3.915.530-2 | 13 Route de Florissant CH 1211, Geneva 12, Switzerland |
| Louis Dreyfus Commodities Asia / Louis Dreyfus Company Asia | Singapore | 199306551Z | 12 Marina Boulevard, Marina Bay Financial Center, Tower 3 33-03, 018982 Singapore |
| Louis Dreyfus Commodities Suisse / Louis Dreyfus Company Suisse SA | Switzerland | NVFY7J3BRKK 56Q11HF07 | 29 Roite de l'Aeroport, 1215-Geneva, Switzerland |
| Cargill Financial Solutions | United States | 549300ST2YOG Z1S5QM17 | 9350 Excelsior Blvd, MS 142-4B, Hopkins MN, 55343 USA (Headquarters Address)<br><br>C/O C T Corporation System, 208 So Lasalle St, Suite 814, Chicago Us-Il Us 60604 (Legal Address) |
| Midwestern Trading Group Inc. | United States | 549300NKCD7P NH5D9S80 | 9350 Excelsior Blvd, MS 142-4B, Hopkins MN, 55343 USA |
| Cargill, Incorporated | United States | 286124 | Registered Office Address: 5200 Willson Road #150, Edina, MN 55424, USA |
| Quadra Commodities Singapore | Singapore | 201210410Z | 28C Stanley Street, 068737 Singapore / 1 George Street, #07-04, One George Street, Singapore 049145 |
| Quadra Commodities SA | Switzerland | CH-660.1.795.010-5 | Route de Florissant 81, 1206-Geneva, Switzerland / rue Albert-Gos 10, 1206 Genève |

| | | | |
|---|---|---|---|
| New Resources International SA (previous name: Noble Resources International SA) | Switzerland | CHE-109.282.756 | Marktstrasse, 7a, Sarnen, 6060 Switzerland |
| Cross Continental Trading Limited | United Kingdom | 06642662 | 33 Cavendish Square, London W1G 0PW |
| Paras Metallics PTE Limited | Singapore | 201212922Z | 171 Tras Street, HEX04-171A, Union Building, 079025, Singapore |
| Liberty Commodities Limited | United Kingdom | 03349135 | 7 Hertford Street, London W1J 7RH |
| Pearl River Delta Trading (Hong Kong) Limited | Hong Kong | 1457061 | Room 1607, Dominion Centre, 43 Queen's Road East, Wanchai, Hong Kong |
| Xangbo Global Markets Pte Ltd | Singapore | 200713446E | 3601 OCBC Centre, 65 Chulia Street, Singapore, 049513 |
| Emporium Trade Pte. Ltd. (previous name: Pan Asia Commodities) | Singapore | 201411204E | Level 30 Six Battery Road, 049909, Singapore |
| Simec Group | Hong Kong | 1651874 | 2202-2204, Gloucester Tower, the Landmark Building, 11 Pedder Street, Central, Hong Kong |
| Wilson International Trading Private Limited | Singapore | 198101445C | 8 Temasek Boulevard, 17-02/03 Suntec Tower 3, Singapore 038988 |
| Intra Asia Trading Pte Ltd | Singapore | 199402508K | 1 Raffles Place, 39-02, Singapore 048616 / WILKIE ROAD, #03-08, WILKIE EDGE, SINGAPORE 228095 |
| Triumph Commodities Pte. Ltd (Triumph Metals And Minerals Pte. Ltd) | Singapore | 201005850E | One Raffles Place, Tower 2 No 27-61A, Singapore 048616 |

10

| Alphatrade International Limited | Hong Kong | 1741949 | Unit 2005, 248 Queen's Road East, Wanchai, Hong Kong |
|---|---|---|---|
| Atlantic Industrial and Trading Pte. Ltd | Singapore | 201105859G | 8 Eu Tong Sen Street, 22-82 the Central, Singapore 059818 |
| Bering Trading Limited | Hong Kong | 1542441 | Suite 503, Tower 2 Lippo Centre, 89 Queensway Admiralty, Hong Kong |
| Ifchor (Switzerland) SA (previous name: Ifchor S.A.) | Switzerland | CH55000761415 | Place Pepinet 1, 1003 Lausanne, Switzerland |
| LDC Trading & Service | Uruguay | 966018574 | Luis Bonavita 1294, Of 901, Montevideo, Uruguay |

(Id. at 18-19)

According to Dooley, the alleged fraudulent scheme "involved 122 import credit agreements with a total value of $3.3 billion." Those financing agreements are listed below:

| No. | Trader | Number of letters of credit | Value of financing |
|---|---|---|---|
| 1 | Cargill / Midwestern | 24 | $ 802,385,680.98 |
| 2 | Louis Dreyfus | 26 | $ 665,238,881.61 |
| 3 | Bunge | 14 | $ 436,583,130.85 |
| 4 | Quadra Commodities | 13 | $ 304,854,406.31 |
| 5 | Noble Group (Cross Continental) / COFCO | 7 | $ 226,934,216.52 |
| 6 | Liberty Commodities | 7 | $ 149,790,542.45 |
| 7 | Atlantic | 3 | $ 131,185,058.94 |
| 8 | Xangbo | 5 | $ 99.310,024.58 |
| 9 | Simec | 5 | $ 88,273,155.00 |
| 10 | Wilson | 4 | $ 91,499,860.35 |
| 11 | Intra Asia | 5 | $ 91,497,857.78 |
| 12 | Triumph | 5 | $ 91,493,591.23 |
| 13 | Bering | 3 | $ 70,792,830.00 |

11

| 14 | Ifchor | | 1 | $ 15,105,323.00 |
| **Total** | | | **122** | **$ 3,264,944,559.60** |

(Id. ¶ 26)

Dooley further alleges that the following U.S. banks acted as correspondent (or intermediary) banks in connection with the transactions referenced above:

| U.S. Bank | Trading Companies involved in transaction | Conduit Companies involved in transaction |
| --- | --- | --- |
| Deutsche Bank Trust Company Americas | Triumph Commodities PTE. Ltd<br>Intra Asia Trading PTE Ltd<br>Xangbo Global Markets PTE Ltd<br>Xangbo Global Markets PTE Ltd<br>Cross Continental Ltd<br>Cross Continental Ltd<br>Atlantic Industrial and Trading PTE Ltd | Dana Overseas Ltd<br>Dana Overseas Ltd<br>Diamond Forca Ltd<br>Darman Finance Ltd<br>Dana Overseas Ltd<br>Anerson Holdings Ltd<br>Dana Overseas Ltd |
| Bank of New York Mellon | Quadra Commodities<br><br>Louis Dreyfus Group<br>Bunge SA<br>Bunge SA<br>Liberty Commodities | Dana Overseas Ltd<br><br>Dana Overseas Ltd<br>Garland Solutions Ltd<br>Rabalo Ltd<br>Reachway Overseas Ltd |
| Standard Chartered Bank | Quadra Commodities | Olyserve Inc |
| UBS AG | Quadra Commodities | Olyserve Inc |
| Societe Generale USA | Louis Dreyfus Group | Blanche Union Ltd |
| JP Morgan Chase Bank NA | Louis Dreyfus Group | Blanche Union Ltd |

(Id. ¶ 59) Dooley further alleges that Citibank NA acted as an intermediary between the commodities trading company Midwestern Trading Group and the Conduit Company Diamond Forca. (Id. ¶¶ 30-39)

In April 2022, Emery Cooke – a British Virgin Islands law firm – was retained by National Bank Trust to "advise [National Bank Trust] in relation to potential claims in the BVI arising out of, inter alia, the allegedly fraudulent trading activities of a number of international commodity traders [listed above]." (Emery Decl. (Dkt. No. 15) ¶¶ 1, 6) Because "[a]ll but one

of the Conduit Companies were incorporated in BVI, . . . [Dooley] believes that BVI is the most

appropriate jurisdiction in which to bring any claims against the Conduit Companies and the

[commodities trading companies]." (23 Misc. 6, Dooley Decl. (Dkt. No. 3) ¶ 53)

In his declaration, Dooley asserts that National Bank Trust intends to initiate a

proceeding in the British Virgin Islands that

> will advance claims under Russian law, specifically articles 1, 10, 1064, and 1080 of the Russian Civil Code. . . .
>
> Under article 1064 (1) of the Civil Code of the Russian Federation, damage caused to the person or property of a citizen, as well as damage to the property of a legal entity, must be compensated in full by the person who caused the damage. Under Article 1080 (1) of the Civil Code of the Russian Federation, the persons who jointly caused the damage are jointly and severally liable to the injured party.
>
> [National Bank Trust] will make the case that the [commodities trading companies] are liable to compensate [National Bank Trust] for the losses caused to Rost [Bank] under the Scheme because the Scheme was only possible with the active involvement of the [commodities trading companies], even if the [commodities trading companies] did not have actual knowledge of the underlying fraud.
>
> It will be necessary for [National Bank Trust] to prove
>
> > a. the existence of a wrongful act;
> > b. the occurrence of harm;
> > c. the causal link between the act of the tortfeasor and the harm; and
> > d. the intent of the tortfeasor.
>
> In this case, the relevant wrongdoing is [B&N Bank's] breaches of the Russian banking regulations (and [B&N Bank's] management's breaches of duty in facilitating such transactions). Rost [Bank] experienced harm because it funded the repayment of the "loans" through . . . the Scheme described above. The causal link is that, but for the involvement of the [commodities trading companies], it would not have been possible for [B&N Bank] to disburse funds to the Conduit Companies directly. Finally, a number of facts evidence the [commodities trading companies' fraudulent] intent, including (i) their knowledge that this was a back-to-back arrangement, (ii) the ultimate beneficiary of the monies was a BVI company with no known assets or ability to repay the loan and with a bank account in Armenia; (iii) they were never at any stage at risk of incurring losses; and (iv) significant commissions were earned for no risk.

(Id. ¶¶ 54-58)

Dooley further asserts "that the [Respondent] Banks will have relevant information because they acted as [U.S.] correspondent banks in a number of the transactions," and thus "[r]ecords from the [Respondent] Banks will enable the BVI Court to ascertain the full extent of wrongdoing by the Conduit Companies and [commodities trading companies,] as well as damage to Rost and [National Bank Trust]." (Id. ¶¶ 59-60)

## II.    BRITISH VIRGIN ISLANDS PROCEEDINGS

On May 4, 2023, "proceedings in the BVI were commenced by [National Bank Trust] against various defendants," including Cargill and the Dreyfus Entities. (Emery Decl. (Dkt. No. 15) ¶¶ 5, 18) The "Statement of Claim supporting [National Bank Trust's] lawsuit was deemed to have been filed on [August 10, 2023]." (Jul. 8, 2025 National Bank Trust Ltr., Ex. A (Morris Decl.) (Dkt. No. 50-1) ¶ 7; see also Particulars of Claim, P.J.S.C. National Bank "Trust" v. Mikail Osmanovich Shishkhanov et al., Case Number BVIHCOM2023/0087 (hereinafter, "Particulars of BVI Claim") (Dkt. No. 70-2) at 2)

The Particulars of Claim alleges that National Bank Trust – as the legal successor to Rost Bank – is entitled under BVI and Russian law to recover funds that Russian businessman Mikhail Shishkhanov embezzled "[b]etween June 2013 and June 2017" through various shell entities that were "incorporated in the BVI" and owned and/or controlled by Shishkhanov and his "close associates." (Particulars of BVI Claim (Dkt. No. 70-2) ¶¶ 16-17; 21; 80-97; 98-106) The Particulars of Claim further alleges that the embezzlement occurred through "a series of co-ordinated sets of transactions" that followed the same two-part scheme Dooley describes. (See id. ¶¶ 21-22) In "Stage 1" of the scheme, "purported Trade Finance Agreements" served as "a mechanism to extract funds from B&N Bank via the [commodities trading companies] to the BVI [Conduit] Companies." (Id. ¶ 22) In "Stage 2," "Rost Bank was caused to pass funds to

14

other offshore companies, which [] were ultimately used to discharge the obligations of the BVI [Conduit] Companies and the [commodities trading companies] under the purported Trade Finance Agreements." (Id.)  As of August 10, 2023, National Bank Trust "estimate[d] [] its total loss arising from the arrangement [to be] US$1,913,819,903.87." (Id. ¶ 104)

"[C]ertain defendants in the BVI [p]roceedings," including Cargill and the Dreyfus Entities, "have sought to have the proceedings dismissed on various procedural grounds," including a jurisdictional challenge.  (Jul. 8, 2025 National Bank Trust Ltr., Ex. A (Morris Decl.) (Dkt. No. 50-1) ¶ 11; P.J.S.C. National Bank "Trust" v. Mikail Osmanovich Shishkhanov et al., Claim No. BVIHC (COM) 2023/0087, Judgment (Nov. 22, 2025) (hereinafter, "Nov. 22, 2025 BVI Jdgmt.") (Dkt. No. 70-3) ¶¶ 8-10, 72 (discussing the jurisdictional challenge raised by "the Cargill Defendants" and "the Appleby Defendants," a category that includes the Dreyfus Entities))  Between October 2, 2025, and October 9, 2025, the Commercial Division of the High Court of Justice in the BVI (hereinafter, the "High Court of Justice") heard argument on these defendants' jurisdictional challenge.  (Nov. 22, 2025 BVI Jdgmt. (Dkt. No. 70-3) ¶¶ 5, 71)

The jurisdictional dispute involved three issues:  "whether the Claimant [National Bank Trust] had properly satisfied the relevant gateways for service out [of the jurisdiction], whether the BVI was the appropriate forum for the resolution of the dispute, and whether, in all the circumstances, the continuation of [a May 5, 2023 order granting National Bank Trust permission to serve parties outside of the jurisdiction] was just and appropriate." (Id. ¶¶ 7, 10, 71)  The High Court of Justice dismissed the defendants' jurisdictional challenges in a November 22, 2025 decision, holding that (1) the gateway requirements to serve foreign defendants "have been established" (id. ¶ 202; see also id. ¶¶ 257, 265); (2) "the BVI is the appropriate forum for

the Claim (and the issues in the Claim) to be tried" (id. ¶ 437); and (3) "there is no (or no satisfactory) basis upon which the [May 22, 2023] order [permitting National Bank Trust to serve parties out of the jurisdiction] should be set aside." (Id. ¶ 602)

## III.   THE INSTANT ACTION

On January 10, 2023, Petitioner National Bank Trust filed an ex parte petition seeking to obtain discovery for use in a then-anticipated foreign proceeding in the British Virgin Islands, pursuant to 28 U.S.C. § 1782. (23 Misc. 6 (Dkt. No. 1) at 1)  National Bank Trust's application includes proposed subpoenas directed to Deutsche Bank Trust Company Americas, Bank of New York Mellon, Standard Chartered Bank, UBS AG, Societe Generale USA, JP Morgan Chase Bank NA, and Citibank NA (collectively, the "Respondent Banks").  (See 23 Misc. 6, Michael Decl., Ex. 1-7 (Dkt. No. 4-1 through Dkt. No. 4-7)

In an April 18, 2023 order, this Court granted National Bank Trust's Section 1782 application and authorized National Bank Trust to "serve each of the Respondent[] [Banks] with subpoenas in substantially the form set forth at Docket Numbers 4-1 through 4-7." (23 Misc. 6, Order Granting Section 1782 Application (Dkt. No. 11) at 3)

On April 29, 2023, Cargill, Inc. initiated another action – Cargill, Incorporated v. Public Joint Stock Company National Bank Trust, 23. Misc. 134 (PGG) – to quash the Section 1782 subpoenas that this Court authorized National Bank Trust to serve on the Respondent Banks in In Re Public Joint-Stock Company National Bank Trust, 23 Misc. 6 (PGG).  (Cargill Mot. (Dkt. No. 1))

On May 4, 2023, Louis Dreyfus Company Suisse SA, Louis Dreyfus Company Asia PTE Ltd., and Louis Dreyfus Company Trading & Service Co. SA moved for leave to intervene as respondents in 23 Misc. 6 (PGG), in order to (1) challenge National Bank Trust's

16

subpoenas, and (2) seek a stay of their obligation to comply with National Bank Trust's subpoenas. (23 Misc. 6, Dreyfus Mot. (Dkt. No. 13))

On June 2, 2023, National Bank Trust filed a brief opposing Cargill's motion to quash (23 Misc. 134, National Bank Trust Opp. to Mot. to Quash (Dkt. No. 14)), as well as a brief addressing the Dreyfus Entities' motion to intervene. (23 Misc. 6, National Bank Trust Br. re Mot. to Intervene (Dkt. No. 20)) Cargill and the Dreyfus Entities filed their replies on June 23, 2023. (Cargill Reply (Dkt. No. 19); Dreyfus Reply (Dkt. No. 39)) On June 30, 2023, National Bank Trust moved for leave to file a sur-reply to both reply submissions. (National Bank Trust Mot. (Dkt. No. 22)) This Court granted that application on July 5, 2023 (Dkt. No. 23), and National Bank Trust filed its sur-reply on July 13, 2023. (National Bank Trust Sur-Reply (Dkt. No. 26))

On August 9, 2023, this Court directed that "[t]he actions bearing docket numbers 23 Misc. 134 (PGG) and 23 Misc. 6 (PGG) . . . shall be consolidated pursuant to Fed. R. Civ. P. 42," and "[t]he actions shall be referred to collectively as In re Public Joint Stock Company National Bank Trust Section 1782 Action, No. 23 Misc. 134 (PGG)." (23 Misc. 6 (Dkt. No. 31) at 2 (emphasis omitted)) This Court directed the "parties to case number 23 Misc. 6 . . . to refile any pending motions and supporting papers on the public docket in case number 23 Misc. 134." (Id.)

## DISCUSSION

### I.    LEGAL STANDARDS

Section 1782(a) provides that

[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the

application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

Section 1782 authorizes district courts to grant such relief only where (1) "the person from whom discovery is sought reside[s] (or [is] found) in the district of the district court to which the application is made"; (2) "the discovery [is] for use in a proceeding before a foreign tribunal"; and (3) "the application [is] made by a foreign or international tribunal or 'any interested person.'" Schmitz v. Bernstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83 (2d Cir. 2004) (quotation marks and citations omitted).

"'[O]nce the statutory requirements are met, a district court is free to grant discovery in its discretion.'" Id. at 83-84 (quoting In re Metallgesellschaft AG, 121 F.3d 77, 78 (2d Cir. 1997)) (alteration in Schmitz); see In re Edelman, 295 F.3d 171, 181 (2d Cir. 2002) ("Congress planned for district courts to exercise broad discretion over the issuance of discovery orders pursuant to § 1782(a) – both over whether to grant a discovery order and, if so, what limits to place on that discovery." (citing S.Rep. No. 88-1580, § 9, reprinted in 1964 U.S.C.C.A.N. at 3788)). "This discretion, however, is not boundless. Rather, . . . 'district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."'" Schmitz, 376 F.3d at 84 (quoting In re Metallgesellschaft, 121 F.3d at 79).

In exercising their discretion, district courts should consider

18

(1) [w]hether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid;

(2) [t]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;

(3) [w]hether the § 1782 request conceals a[n] attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and

(4) [w]hether the subpoena contains unduly intrusive or burdensome requests.

In re Warren, No. 20 MISC. 208 (PGG), 2020 WL 6162214, at *4-5 (S.D.N.Y. Oct. 21, 2020) (citing In re Microsoft Corp., 428 F. Supp. 2d 188, 192-93 (S.D.N.Y. 2006) and Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264-65 (2004), abrogated on other grounds by In re del Valle Ruiz, 939 F.3d 520 (2d Cir. 2019)).

"A court considering a request for discovery under § 1782 must also be mindful of U.S. federal discovery procedures under Rules 26 and 45 of the Federal Rules of Civil Procedure." In re Auto-Guadeloupe Investissement S.A., No. 12 MC 221 (RPP), 2012 WL 4841945, at *4 (S.D.N.Y. Oct. 10, 2012); see In re Gushlak, No. 11 MC 218 (NGG), 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) ("Section 1782(a) mandates that discovery under the statute be produced 'in accordance with the Federal Rules of Civil Procedure.' Accordingly, the court is guided by Rules 26 and 45, which govern third-party discovery."), aff'd sub nom. Gushlak v. Gushlak, 486 F. App'x 215 (2d Cir. 2012).

"Federal Rule of Civil Procedure 26(b)(1) states, in relevant part, that '[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . .'" Bridges v. Corr. Servs., No. 17-CV-2220 (NSR), 2020 WL 6899695, at *4 (S.D.N.Y. Nov. 24, 2020) (quoting Fed. R. Civ. P. 26(b)(1)). "'Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept.'"

Id. (quoting Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). However, "'[w]hile Rule 26(b)(1) provides for broad discovery, courts should not grant discovery requests based on pure speculation that amount to nothing more than a "fishing expedition" into actions or past wrongdoing not related to the alleged claims or defenses.'" Id. (quoting Collens v. City of New York, 222 F.R.D. 249, 253 (S.D.N.Y. 2004)).

"As . . . frequently is the case in § 1782 proceedings, leave to serve the subpoenas [here] was granted ex parte, which is appropriate because all questions with respect to the propriety of the grant of leave and with respect to the content [of] the subpoenas are available to every subpoenaed party via a motion to quash or the defense of an application to compel compliance with the subpoenas." In re Ex Parte Application of Porsche Automobile Holding SE for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings, No. 15-MC-417 (LAK), 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. w18, 2016).

"Federal Rule of Civil Procedure 45[(d)](3)(A)(iv) provides that a court must quash or modify a subpoena that 'subjects a person to undue burden.'" Sanofi-Synthelabo v. Apotex Inc., No. 02 Civ. 2255 (SHS), 2009 WL 5247497, at *3 (S.D.N.Y. Dec. 30, 2009) (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)), aff'd sub nom. Sanofi-Aventis v. Apotex Inc., 659 F.3d 1171 (Fed. Cir. 2011). "Whether a subpoena subjects a witness to undue burden within the meaning of Rule 45[(d)](3)(A)(iv) 'depends upon such factors as relevance . . . and the burden imposed.'" Kirschner v. Klemons, No. 99 Civ. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (quoting Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 49 (S.D.N.Y.1996)) (quotation marks omitted).

"The movant . . . carr[ies] the burden of proving that a subpoena imposes an undue burden on a witness." Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 262 F.R.D. 293, 299 (S.D.N.Y. 2009). "Because the burden is on the party seeking to quash a subpoena, . . . that party cannot merely assert that compliance with the subpoena would be burdensome without setting forth the manner and extent of the burden and the probable negative consequences of insisting on compliance. . . . [I]nconvenience alone will not justify an order to quash a subpoena that seeks potentially relevant testimony." Kirschner, 2005 WL 1214330, at *2 (citing Concord Boat, 169 F.R.D. at 48 and Croom v. Western Conn. State Univ., 218 F.R.D. 15, 17 (D. Conn. 2002)). "A subpoena that 'pursues material with little apparent or likely relevance to the subject matter,' however, is likely to be quashed as unreasonable even where the burden of compliance would not be onerous." Id. (quoting Concord Boat Corp., 169 F.R.D. at 50).

## II.    ANALYSIS

In its January 10, 2023 Section 1782 petition, National Bank Trust contends that the document discovery that it seeks is relevant to "anticipated litigation in the British Virgin Islands" concerning the "complex fraudulent scheme" discussed above. (23 Misc. 6, National Bank Trust Br. (Dkt. No. 2) at 4) According to National Bank Trust, "[t]he discovery [it] seeks consists of correspondent banking records that [National Bank Trust] expects will shed light on the full nature and scope of the [s]cheme." (Id.)

As stated above, the August 10, 2023 Particulars of Claim National Bank Trust filed in the BVI Proceeding raises claims under BVI law and Articles 1, 10, 1064, and 1080 of the Russian Civil Code. (Particulars of Claim (Dkt. No. 70-2) ¶¶ 98-100) In its January 10, 2023 Section 1782 petition, National Bank Trust states that – to prevail on its then-anticipated "claims under Russian law, specifically Articles 1, 10, 1064, and 1080 of the Russian Civil

21

Code" – it "will be required to show (1) the existence of a wrongful act; (2) the occurrence of harm; (3) the causal link between the act of the tortfeasor and the harm; and (4) the intent of the tortfeasor." (23 Misc. 6, National Bank Trust Br. (Dkt. No. 2) at 9)  National Bank Trust further states that the fraud scheme set forth in the Dooley declaration – and later in its BVI Particulars of Claim (see Particulars of BVI Claim (Dkt. No. 70-2) ¶¶ 21-22) – "satisfies all of these elements, and [that] banking records from the Respondent Banks will be critical to making its case" (23 Misc. 6, National Bank Trust Br. (Dkt. No. 2) at 6, 9), because "the discovery sought under this [Section 1782] Application will enable [National Bank Trust] to identify the scope of the [s]cheme as well as potential other participants." (Id. at 11)

National Bank Trust further contends that its application meets all three Section 1782 requirements because (1) each Respondent Bank is located in this District; (2) the discovery it seeks – records of the banking activity of the Conduit Companies – is relevant and "for use" in the British Virgin Islands proceeding discussed above; and (3) National Bank Trust is an "interested person," given that it will be a "party to the anticipated BVI litigation." (Id. at 10-11)

National Bank Trust also argues that the discretionary factors under Section 1782 weigh in its favor, because (1) the Respondent Banks "will not be parties to or participants in the foreign proceedings," and thus "the information sought under the [Section 1782] Application would otherwise be unavailable"; (2) "BVI courts would be receptive to the assistance of a U.S. court and the discovery sought under the [Section 1782] Application," as "[n]othing in BVI law would preclude the use of the information requested from Respondents, i.e., relevant evidence of wire or banking activity by the Conduit Companies"; (3) "the [Section 1782] Application does not conceal any attempt to circumvent foreign proof-gathering restrictions," as it "seeks

22

information that is intended to be used in contemplated foreign proceedings in BVI," "[t]he information being sought (bank records) is a type that is routinely sought, provided, and used in a wide variety of legal proceedings, in [the] BVI and elsewhere," and "[t]here are no applicable restrictions under BVI law, and no reason to think that such discovery would circumvent or contravene any relevant proof-gathering restrictions"; and (4) "the information sought under the [Section 1782] Application is not unduly intrusive or burdensome," as National Bank Trust's proposed subpoenas "are narrowly tailored to seek relevant information concerning the Conduit Companies' transactions," and "[b]ank records, such as the wire transfer records requested in the subpoenas, are stored as a matter of course and are routinely sought from and produced by banks located in this District under Section 1782." (Id. at 12-13)

In moving to quash National Bank Trust's subpoenas, Cargill argues that "the requested discovery is not 'for use' in a foreign proceeding," and that "the subpoenas are unduly intrusive." (Cargill Br. (Dkt. No. 2) at 11-22 (emphasis omitted)) In seeking leave to intervene, the Dreyfus Entities likewise argue that National Bank Trust's subpoenas should be quashed because "[t]he discovery sought is not 'for use' in a foreign proceeding." (Dreyfus Br. (Dkt. No. 35) at 10 (emphasis omitted)) Finally, both Cargill and the Dreyfus Entities ask this Court stay enforcement of the subpoenas until the British Virgin Islands courts have confirmed their jurisdiction over the proceeding NBT initiated there. (Cargill Reply (Dkt. No. 19) at 6-8; Dreyfus Reply (Dkt. No. 39) at 5-7)

### A.    Standing

Cargill and the Dreyfus Entities are not the targets of the subpoenas authorized in this Court's April 18, 2023 order. Cargill nonetheless contends that it has standing to move to quash National Bank Trust's subpoenas because (1) National Bank Trust states in its Section 1782 application that it "inten[ds] to pursue claims against . . . Cargill" in the British Virgin

23

Islands; and (2) "the 'ultimate targets of a § 1782 discovery order issued to third parties have standing to challenge the district court's power to issue a subpoena under the terms of an authorizing statute.'" (Cargill Br. (Dkt. No. 2) at 10-11 (quoting In re Devine, 2022 WL 1658586, at *3 (S.D.N.Y. May 25, 2022) (internal quotation marks and citations omitted))) The Dreyfus Entities argue that they have standing to intervene in this action for substantially the same reasons. (See Dreyfus Br. (Dkt. No. 35) at 7, 15 (asserting that (1) the Dreyfus Entities have a "'direct, substantial, and legally protectable' interest in the discovery because [National Bank Trust] seeks confidential bank records" that "it plans to use against [the Dreyfus Entities]" in the BVI Proceedings, and (2) "the ultimate targets of a § 1782 discovery order issued to third parties have standing to challenge the district court's power to issue a subpoena under the terms of an authorizing statute." (citing In re Hornbeam Corp., No. 14MISC424PART1, 2015 WL 13647606, at *3 (S.D.N.Y. Sept. 17, 2015), aff'd, 722 F. App'x 7 (2d Cir. 2018)))

National Bank Trust does not dispute that Cargill and the Dreyfus Entities have standing to move to quash the subpoenas. (See National Bank Trust Opp. to Cargill Mot. to Quash (Dkt. No. 14); see also National Bank Trust Opp. to Dreyfus Entities Mo. (Dkt. No. 36))

In Application of Sarrio, S.A., 119 F.3d 143, 148 (2d Cir. 1997), the Second Circuit held that "standing to oppose subpoenas issued under § 1782 is [not] limited to the subpoenaed witness. We have recognized, though implicitly, that parties against whom the requested information will be used may have standing to challenge the lawfulness of discovery orders directed to third parties." Id. (citing In re Letters Rogatory Issued by Dir. of Inspection of Gov't of India, 385 F.2d 1017 (2d Cir. 1967); In re Request for Int'l Judicial Assistance, 687 F.Supp. 880, 887 (S.D.N.Y. 1988), rev'd on other grounds, 936 F.2d 702 (2d Cir. 1991)). Courts in this District have since found that third parties have standing to challenge subpoenas issued

24

pursuant to Section 1782 applications if the discovery sought is to be used in foreign proceedings against those third parties. See, e.g., In re Hornbeam Corp., 2015 WL 13647606, at *2 (S.D.N.Y. Sept. 17, 2015) ("Hornbeam represented in the [Section 1782] Application that Symeou was among the parties against whom it intended to initiate proceedings in the BVI. . . . Therefore, Symeou is a 'part[y] against whom the requested information will be used' and has standing to challenge the issuance of § 1782 subpoenas under the Rules of Civil Procedure and under the statute itself." (quoting Application of Sarrio, S.A., 119 F.3d at 148) (internal citations omitted)), aff'd, 722 F. App'x 7 (2d Cir. 2018).

As discussed above, National Bank Trust seeks the discovery at issue in aid of a proceeding in the British Virgin Islands. Both Cargill and the Dreyfus Entities are named as defendants in that action. (Particulars of Claim (Dkt. No. 70-2) at 2) As a result, they have standing to challenge National Bank Trust's subpoenas. See Matter of Upper Brook Companies, No. 22-MC-97 (PKC), 2022 WL 18046694, at *3 (S.D.N.Y. Dec. 29, 2022) (although movant seeking to quash subpoena authorized pursuant to Section 1782 was not a recipient of the subpoena, movant had standing to challenge the subpoena because "'[p]arties against whom the requested information will be used may have standing to challenge the lawfulness of discovery orders directed to third parties'" (quoting Application of Sarrio, S.A., 119 F.3d at 148)).

## B.    The Dreyfus Entities' Motion to Intervene

The Dreyfus Entities seek to intervene in this action as a matter of right under Fed. R. Civ. P. 24(a)(2), or pursuant to this Court's discretion under Fed. R. Civ. P. 24(b).[7]

---

[7] Fed. R. Civ. P. 24(a)(2) provides:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or

(Dreyfus Br. (Dkt. No. 35) at 14-17)  According to the Dreyfus Entities, "[c]ourts routinely grant intervention as of right [under Fed. R. Civ. P. 24(a)(2)] in cases involving requests for judicial assistance under 28 U.S.C. § 1782," (id. at 14 (citing In re SPS I Fundo de Investimento de Acoes Investimento no Exterior, No. 22-mc 00118 (LAK), ECF No. 17 at 1 (S.D.N.Y. May 20, 2022); In re Rep. of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. § 1782, 110 F.Supp.3d 512, 513 n.1 & 514 (S.D.N.Y. 2015))), and the Dreyfus Entities go on to argue that they "meet[] the statutory requirements for intervention as of right" because, inter alia, they

> have a direct, substantial, and legally protectable interest in the discovery because [National Bank Trust] seeks confidential bank records and other information from multiple respondents relating to dozens of letters of credit allegedly issued to [the Dreyfus Entities] totaling more than $665 million in financing, which [National Bank Trust] states it plans to use against [the Dreyfus Entities] in proceedings that [National Bank Trust] purportedly plans to bring in the BVI.

(Id. at 14-15 (internal quotation marks omitted))

The Dreyfus Entities further contend that "[t]he Court should permit intervention under Federal Rule of Civil Procedure 24(b), which authorizes the district court to 'permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact'" (id. at 17 (quoting Fed. R. Civ. P. 24(b)(1)(B))), because such motions to intervene are "routinely grant[ed] . . . in 28 U.S.C. § 1782 proceedings." (Id. at 17 (citing In

---

impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

In addition, under Fed. R. Civ. P. 24(b), "the court may" – on a timely motion – "permit anyone to intervene[] who is given a conditional right to intervene by a federal statute; or has a claim or defense that shares with the main action a common question of law or fact." The Rule further instructs, in relevant part, that "[i]n exercising its discretion, the court must consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

re Hornbeam Corp., 2015 WL 13647606 at *3; De Leon v. Clorox Co., No. 19-mc-80296-DMR, 2020 WL 4584204, at *4 (N.D. Cal. Aug. 10, 2020)))

National Bank Trust does not oppose the Dreyfus Entities' intervention motion. (See National Bank Trust Br. re Mot. to Intervene (Dkt. No. 36) at 6)

Courts in this District routinely grant unopposed motions to intervene where the discovery sought under Section 1782 is intended to be used against the proposed intervenors in foreign proceedings. See, e.g., In re Bourlakova, No. 24-MC-71 (JPO), 2024 WL 4839047, at *2 (S.D.N.Y. Nov. 20, 2024), aff'd, No. 24-3187-CV, 2025 WL 1733495 (2d Cir. June 23, 2025) (granting unopposed motion to intervene where the Section 1782 petitioners "intend to use the requested discovery in their U.K. Proceeding against the [proposed intervenors]" (citing Application of Sarrio, S.A., 119 F.3d 143, 148 (2d Cir. 1997))); In re Orthogen Int'l GmbH, No. 24-MC-504 (VSB), 2025 WL 1268843, at *6 (S.D.N.Y. Apr. 30, 2025) (granting unopposed motion to intervene under Fed. R. Civ. P. 24(a)(2) "because the requested discovery will be used against [the proposed intervenor] in the Contemplated German Proceeding." (citing Application of Sarrio, S.A., 119 F.3d at 148)).

As discussed above, National Bank Trust seeks the discovery at issue in aid of a British Virgin Islands proceeding, and the Dreyfus Entities are defendants in that action. (See Jul. 8, 2025 National Bank Trust Ltr., Ex. A (Morris Decl.) (Dkt. No. 50-1) ¶¶ 4-11) Given these circumstances, the Dreyfus Entities' motion to intervene will be granted. See, e.g., In re Orthogen Int'l GmbH, 2025 WL 1268843, at *6.

27

## C.    Whether the Statutory Factors under Section 1782 Are Satisfied

As to the statutory factors under Section 1782, the parties dispute only whether the discovery sought is "for use" in a foreign proceeding.[8]  (See Cargill Br. (Dkt. No. 2) at 11-19; Dreyfus Br. (Dkt. No. 35) at 10-14)  In connection with this factor, courts consider whether "there is actually a foreign proceeding" or an anticipated foreign proceeding and, if so, "whether [that] foreign proceeding is adjudicative in nature." Euromepa, S.A. v. R. Esmerian, Inc., 154 F.3d 24, 27 (2d Cir. 1998).  If there is an actual or anticipated foreign proceeding, courts go on to consider whether the discovery sought may "be employed with some advantage or serve some use" in that proceeding. Mees v. Buiter, 793 F.3d 291, 298 (2d Cir. 2015).

### 1.    Foreign Proceeding Requirement

In its January 10, 2023 Section 1782 application, National Bank Trust argues that the British Virgin Islands litigation it intends to bring "will clearly serve an adjudicative function," and that that proceeding is "in reasonable contemplation," given National Bank Trust's explanation of its claims under Russian law and the evidence of alleged wrongdoing it describes.  (23 Misc. 6, National Bank Trust Br. (Dkt. No. 2) at 10-11)  Moreover, on May 4, 2023 – about four months after filing its Section 1782 application – National Bank Trust filed an action in the British Virgin Islands in furtherance of its stated claims, naming Cargill, the Dreyfus Entities, and others as defendants.  (Emery Decl. (Dkt. No. 15) ¶¶ 5, 18; see also Particulars of BVI Claim (Dkt. No. 70-2) at 2)

In arguing that National Bank Trust has not demonstrated that the then-contemplated British Virgin Islands action described in the Section 1782 application is a

---

[8]  Cargill and the Dreyfus Entities do not dispute that the Respondent Banks are found within this District and that National Bank Trust is an "interested person" within the meaning of Section 1782.  (See Cargill Br. (Dkt. No. 2); Dreyfus Br. (Dkt. No. 35))

qualifying foreign proceeding, Cargill and the Dreyfus Entities' sole argument is that the British Virgin Islands action is not within "reasonable contemplation." (See Cargill Br. (Dkt. No. 2) at 13-19; Dreyfus Br. (Dkt. No. 35) at 12-14)  Given that National Bank Trust has since filed its action in the British Virgin Islands, this argument is now moot. See Mees v. Buiter, 793 F.3d 291, 299 n.11 (2d Cir. 2015) (noting that because the Section 1782 petitioner had – since the district court proceedings – "instituted an action in the Netherlands, the 'within reasonable contemplation' issue is apparently moot"). Accordingly, the foreign proceeding requirement is satisfied here.

### 2. Whether the Discovery Sought by National Bank Trust "may be Employed with Some Advantage or Serve Some Use" in the BVI Proceedings

Cargill and the Dreyfus Entities argue that the Section 1782 subpoenas authorized by this Court cannot "be employed with some advantage or serve some use" in the BVI Proceeding, because National Bank Trust has not established that courts in the British Virgin Islands have jurisdiction them.[9] (See Dreyfus Br. (Dkt. No. 35) at 10 (quoting Clifton Decl. (Dkt. No. 3) ¶ 7) ("'The BVI [c]ourts have no jurisdiction to hear the prospective BVI claim because there is not a sufficient nexus to the BVI.'"); see also Cargill Br. (Dkt. No. 2) at 12 ("[T]here is no practical ability to introduce evidence into a proceeding that cannot exist in the first lace, including due to lack of jurisdiction.") (internal quotations omitted)) As discussed

_____

[9] The Dreyfus Entities also argue that National Bank Trust has not established that the discovery sought may "be employed with some advantage or serve some use" in the BVI, because National Bank Trust "will never be able to hire counsel in the BVI (a requirement in order to proceed in the Commercial Division of the BVI Court)" due to "unprecedented global sanctions" on "the Central Bank of Russia, the National Wealth Fund of the Russian Federation, the Ministry of Finance of the Russian Federation, and other Russian financial authorities." (Dreyfus Br. (Dkt. No. 35) at 11-12 (citing Clifton Decl. (Dkt. No. 3) ¶¶ 31, 33)) Because National Bank Trust has initiated proceedings in the BVI with the aid of BVI counsel (see Emery Decl. (Dkt. No. 15) ¶¶ 5-6), this argument is moot.

above, however, in a November 22, 2025 decision the High Court of Justice found that BVI courts have jurisdiction over National Bank Trust's claims. (See Nov. 22, 2025 BVI Jdgmt. (Dkt. No. 70-3) ¶¶ 437, 606) Accordingly, Cargill and the Dreyfus Entities' argument that National Bank Trust lacks "'the practical ability to inject the requested information into [the BVI] proceeding'" is both meritless and moot. (Cargill Reply (Dkt. No. 19) at 4 (quoting In re Accent Delight Int'l Ltd., 869 F.3d 121, 132 (2d Cir. 2017)))

In briefing their motions to quash, Cargill and the Dreyfus Entities argue that the British Virgin Island courts lack jurisdiction because (1) National Bank Trust's claims lack "a sufficient connection to the BVI to order extraterritorial service on Cargill" (Cargill Br. (Dkt. No. 2) at 12-13); (2) National Bank Trust "lacks any alternative gateway to seek such an order as there is no nexus between the claims and BVI" (id. at 12-13; see also Dreyfus Br. (Dkt. No. 35) at 10 (quoting the Clifton Decl. (Dkt. No. 3) ¶ 7) ("'[T]he BVI Courts have no jurisdiction to hear the [] BVI claim because there is not a sufficient nexus to the BVI.'")); (3) the "BVI is not clearly or distinctly the appropriate forum for the trial of [National Bank Trust's] claims, which are said to arise under Russian law and concern allegations of wrongdoing which occurred exclusively outside the BVI" (Cargill Br. (Dkt. No. 2) at 13);[10] and (4) that there are no defendants in the BVI, because "'[a]ll of the Conduit Companies have been liquidated or

---

[10] In briefing their motion to intervene, the Dreyfus Entities raise certain arguments about arbitration agreements allegedly signed by certain Conduit Companies. (See Dreyfus Br. (Dkt. No. 35) at 11 ("To the extent that the BVI jurisdictional hook is the dissolved Conduit Companies" who did business with the Dreyfus Entities, "those Conduit Companies agreed to arbitrate in London.")) While the High Court of Justice's November 22, 2025 decision does not specifically address these arbitration agreements, the High Court finds that BVI courts have jurisdiction over National Bank Trust's claims against the Dreyfus Entities. Since the issuance of the High Court's decision, the Dreyfus Entities have not argued that these arbitration agreements remain relevant. (See Dec. 17, 2025 Dreyfus Ltr. (Dkt. No. 58); Dec. 23, 2025 Dreyfus Ltr. (Dkt. No. 63))

30

dissolved.'" (Dreyfus Br. (Dkt. No. 35) at 11 (quoting Dooley Decl. (23 Misc. 6, Dkt. No. 3) ¶ 10)))

The High Court of Justice rejected each of these arguments in its November 22, 2025 decision. As to the first three points, the High Court (1) held that the gateway requirements to serve foreign defendants "have been established"; (2) upheld a May 11, 2023 order permitting National Bank Trust to effectuate service on defendants located outside the BVI; and (3) found "that the BVI is the appropriate forum for [National Bank Trust's] Claim (and the issues in the Claim) to be tried." (Nov. 22, 2025 BVI Jdgmt. (Dkt. No. 70-3) ¶¶ 202, 257, 265, 606)

As to the last point, the High Court considered "whether the BVI Defendants possess any assets in [the BVI] or in any other jurisdiction against which [National Bank Trust] might enforce any judgment obtained in these Proceedings." (Id. ¶ 102) In this regard, the High Court says that

> [w]hatever the Defendants may say about the solvency or otherwise of the BVI Defendants, if the BVI Defendants are insolvent, it is difficult to understand why the Former Directors wish to return the BVI Defendants to voluntary liquidation, or to discharge or rescind the liquidation and seek control of those entities. They must believe, contrary to what the Defendants suggest, that the BVI Defendants are not insolvent, or, if they are, that they can soon be returned to solvency.

(Id. ¶ 113)[11] The High Court goes on to say that it is "satisfied that there is a real issue between the Claimant and the BVI Defendants" to be adjudicated. (Id. ¶ 185)

Notwithstanding the High Court's decision, the Dreyfus Entities and Cargill maintain in December 17, 2025 correspondence that "[t]hreshold jurisdictional issues remain in the BVI Proceeding," in part because they are appealing the High Court's decision. (Dec. 17,

---

[11] In its November 22, 2025 decision, the High Court defines the "BVI Defendants" as "BVI entities allegedly controlled by Mr. Shishkhanov." (See Nov. 22, 2025 BVI Jdgmt. (Dkt. No. 70-3) ¶ 20)

31

2025 Dreyfus Ltr. (Dkt. No. 58) at 1-2 (cleaned up); Dec. 17, 2025 Cargill Ltr. (Dkt. No. 59) at 1) Both Cargill and the Dreyfus Entities also argue that National Bank Trust still lacks the "practical ability" to use its desired discovery in the BVI, because the Court of Appeal for the Eastern Caribbean Supreme Court has stayed the BVI Proceeding pending their appeal of the High Court's November 22, 2025 decision. (Dec. 26, 2025 Cargill Ltr. (Dkt. No. 64) (noting that the Court of Appeal granted "an interim stay of the BVI proceedings on December 22, 2025"); see also Feb. 24, 2026 Cargill Ltr. (Dkt. No. 71) ("[o]n February 17, 2026, the Court of Appeal[] approved the Cargill Defendant[s'] application granting a full stay of the BVI proceeding in the lower court, pending determination of the jurisdiction appeals challenge"); Feb. 25, 2026 Dreyfus Ltr. (Dkt. No. 72) (same))

Section 1782 does not require a U.S. court to delay authorizing discovery while a jurisdictional appeal wends its way through a foreign court's appellate system, however. In re Bouka, 654 F. Supp. 3d 283 (S.D.N.Y. 2023) is instructive on this point. In that case, a party moving to quash Section 1782 subpoenas argued that, "because of a pending appeal, '[the petitioner] has no ability to submit evidence at this time, and it is possible that he never will.'" In re Bouka, 654 F. Supp. 3d at 288. The In re Bouka court ruled that "the pending appeal does not provide a basis for the Court to reconsider its order permitting discovery":

> It is of no moment that the proceeding could theoretically be terminated if the appeal were successful. The fact is that the criminal proceeding exists now, and that is enough for us to find, at least in this case, that the proceeding's future vitality – and thus future amenability to receiving evidence – is "within reasonable contemplation."

Id. at 289 (quoting Intel, 542 U.S. at 259). The same is true here. Indeed, the foreign proceeding at issue has now been pending in the BVI for three years.

The stay order and pending appeal in the BVI Proceeding do not support the motions to quash, because "[t]here is no requirement in case law that a proceeding be active to satisfy the 'for use' requirement." Id.; see also In re Application of Gorsoan Ltd. & Gazprombank OJSC for an Ord. Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proceeding, No. 13 MISC. 397 PGG, 2014 WL 7232262, at *6 n.2 (S.D.N.Y. Dec. 10, 2014) ("Movants have cited no case suggesting that an appeal in a foreign proceeding prevents a U.S. court from granting discovery under Section 1782."), aff'd sub nom. Gorsoan Ltd. v. Bullock, 652 F. App'x 7 (2d Cir. 2016). And, as the Second Circuit has stated, "requiring an applicant to wait until the stage in the foreign proceeding at which the materials are to be used before applying for discovery under § 1782 – which might entail multiple, separate applications – would be contrary to the statute's aim of 'providing efficient means of assistance to participants in international litigation.'" Mees, 793 F.3d at 300 (quoting Brandi-Dohrn v. IKB Deutsche Industriebank AG, 673 F.3d 76, 81 (2d Cir. 2012)). Indeed, "'it is Petitioner [that] may suffer irreparable harm – and thus be substantially injured – if a stay is granted. That is because, with a stay pending appeal here, Petitioner may lose altogether any chance to use the materials [it] seeks in the [British Virgin Islands] proceedings.'" In re Aso, No. 19MC190JGKJLC, 2019 WL 2572491, at *3 (S.D.N.Y. June 21, 2019) (emphasis in original) (cleaned up) (quoting In re Noguer, No. 18-MC-498 (JMF), 2019 WL 1034190, at *5 (S.D.N.Y. Mar. 5, 2019)).

In any event, "[d]istrict courts have consistently held that a district court need not await a foreign tribunal's determination that it has jurisdiction before granting an application for a Section 1782 subpoena." In re Navios S. Am. Logistics Inc., No. 24-MC-575 (LJL), 2025 WL 369717, at *5 (S.D.N.Y. Feb. 3, 2025) (internal quotation marks omitted) (citing In re Peruvian Sporting Goods S.A.C., 2018 WL 7047645, at *5 (D. Mass. Dec. 7, 2018)); accord In re

33

Tovmasyan, 557 F. Supp. 3d 348, 355 (D.P.R. 2021); In re Republic of Ecuador, 2011 WL 4434816, at *6 (N.D. Cal. Sept. 23, 2011); In re Republic of Ecuador, 2011 WL 10618727, at *4 (N.D. Fla. Aug. 24, 2011). "Section 1782 requires only that the foreign proceeding be within reasonable contemplation. . . . In such early stages of pre-litigation, the foreign authority's jurisdiction may be an open question requiring jurisdictional discovery or alternatively may be answered by the defendant's consent only after discovery has taken place pursuant to Section 1782." In re Brookfield Infrastructure Partners L.P., No. 24-MC-533 (LJL), 2025 WL 1503942, at *10 (S.D.N.Y. May 27, 2025) (internal quotation marks and citations omitted).

It would run counter to the purpose of Section 1782 to permit "[t]he subject of a Section 1782 request [to] defeat the obligation to produce documents by the mere expedient of filing a motion seeking dismissal in the foreign jurisdiction and then arguing before the district court that the dismissal motion is meritorious." See In re Navios S. Am. Logistics Inc., No. 24-MC-575 (LJL), 2025 WL 369717, at *5 (S.D.N.Y. Feb. 3, 2025). In sum, the jurisdictional challenges pending in the BVI do not demonstrate that the discovery at issue here lacks practical use.[12]

---

[12] In their December 17, 2025 letter, the Dreyfus Entities state that they have mounted a separate challenge to "service of process in the BVI Proceeding" that the High Court did not address in its November 22, 2025 decision. (Dec. 17, 2025 Dreyfus Ltr. (Dkt. No. 58) at 1-2 (cleaned up)) The Dreyfus Entities do not provide any details concerning the factual or legal basis for this argument, however. (See id.)

In any event, and as discussed above, "where the foreign proceeding is currently pending, the court need not await a ruling on jurisdiction that is a matter of conjecture." In re Navios S. Am. Logistics Inc., 2025 WL 369717, at *5. "The notion that it would somehow be premature for this Court to allow the requested discovery until the [foreign court] has determined it has jurisdiction to hear the matter runs contrary to clear and unequivocal case law providing that, to fall within the scope of § 1782(a), a proceeding need only be 'within reasonable contemplation,' not pending or imminent." In re Veiga, 746 F. Supp. 2d 8, 23 (D.D.C. 2010) (quoting Intel, 542 U.S. at 259).

Given this determination, a stay of discovery "pending confirmation of proper jurisdiction by the BVI Court[s]" – the alternative form of relief requested by Cargill and the Dreyfus Entities in their motions to quash – is also not appropriate. (Cargill Reply (Dkt. No. 19) at 6 (cleaned up); see also Dreyfus Reply (Dkt. No. 39) at 3)

Cargill argues, however, that "[c]ourts in this District frequently exercise discretion to stay discovery where another case or proceeding has the potential to affect the court's analysis," "particularly . . . in matters involving jurisdictional issues because the outcome may eliminate the need for the discovery altogether." (Cargill Reply (Dkt. No. 19) at 6 (citing Renois v. WVMF Funding LLC, 2021 WL 1721818, at * 2 (S.D.N.Y. Apr. 30, 2021); Republic of Turkey v. Christie's, Inc., 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018))) But the High Court's jurisdictional ruling is adverse to Cargill and the Dreyfus Entities, and there is no basis for this Court to assume that that ruling will be overturned. Indeed, "Section 1782 does not 'condone [such] speculative forays into legal territories unfamiliar to federal judges.'" In re Navios S. Am. Logistics Inc., No. 24-MC-575 (LJL), 2025 WL 369717, at *5 (S.D.N.Y. Feb. 3, 2025) (quoting Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1099-100 (2d Cir. 1995)).

The Dreyfus Entities similarly argue that "this Court should stay any compliance with the subpoenas" until after the appeals of the High Court's decision have been resolved. (Dreyfus Reply (Dkt. No. 39) at 3 (citing IJK Palm LLC v. Anholt Servs. USA, Inc., 33 F.4th 669, 680 (2d Cir. 2022))) According to the Dreyfus Entities, "there is no need to provide the requested discovery to National Bank Trust now, when . . . it cannot use the discovery" until the appeals are resolved. (Dreyfus Reply (Dkt. No. 39) at 5)

As discussed above, however, the High Court has already ruled that the BVI courts have jurisdiction over National Bank Trust's claims. And this Court has found that

National Bank Trust has demonstrated that the discovery it seeks can "be employed with some advantage or serve some use" in the BVI Proceeding.  Given these circumstances, a stay of discovery in the instant action is not appropriate.[13]

## D.    Whether the Discretionary Factors are Satisfied

As to the four discretionary factors set forth in Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004), Cargill and the Dreyfus Entities dispute only the fourth factor, which requires a court to consider "[w]hether the subpoena contains unduly intrusive or burdensome requests."  In re Warren, 2020 WL 6162214, at *5; see also Cargill Br. (Dkt. No. 2) at 20-21; Dec. 17, 2025 Dreyfus Ltr. (Dkt. No. 58) at 3))

National Bank Trust contends that its Section 1782 "subpoenas . . . are narrowly tailored to seek relevant information concerning the Conduit Companies' transactions," and that

---

[13] Cargill and the Dreyfus Entities have cited no case in which a court has stayed discovery authorized under Section 1782 pending confirmation of a foreign court's jurisdiction, much less a case in which a stay was granted where (1) the foreign court had ruled that it had jurisdiction but (2) that decision was being appealed.

Renois v. WVMF Funding LLC, 2021 WL 1721818, at *2 (S.D.N.Y. Apr. 30, 2021) and Republic of Turkey v. Christies, Inc., 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018) – cited by Cargill (Cargill Reply (Dkt. No. 19) at 6) – do not involve requests to stay discovery authorized under Section 1782.  And while In re Alpene, Ltd., No. 21MC2547MKBRML, 2022 WL 15497008, at *1 (E.D.N.Y. Oct. 27, 2022) involves a stay of discovery authorized under Section 1782, the stay was premised on an expected decision from the United States Supreme Court – which the district court found "had the potential to affect the outcome of this matter" – rather than on an expected decision from a foreign court.  Id.  Similarly, in In re XPO Logistics, Inc., No. 15 MISC. 205 (LGS), 2017 WL 6343689, at *2 (S.D.N.Y. Dec. 11, 2017), a partial stay of discovery was granted concerning Section 1782 discovery, but nothing in that decision suggests that the stay was granted pending the foreign court's determination as to jurisdiction.  See id.

IJK Palm LLC v. Anholt Servs. USA, Inc., 33 F. 4th 669 (2d Cir. 2022) – cited by the Dreyfus Entities (Dreyfus Br. (Dkt. No. 39) at 3) – does not involve a request for a stay of discovery authorized under Section 1782.  Instead, the IJK Palm LLC court held that the Section 1782 petitioner had not satisfied Section 1782's statutory requirements, because it "ha[d] not provided a sufficient basis to conclude that it could bring [its contemplated] suit . . . in the Cayman Islands," and "[a]s a result[] the requested discovery material [was] not 'for use' with respect to that potential . . . suit."  Id. at 681.

"[b]ank records, such as the wire transfer records requested in the subpoenas, are stored as a matter of course and are routinely sought from and produced by banks located in this District under Section 1782." (23 Misc. 6, National Bank Trust Br. (Dkt. No. 2) at 13 (citing In re Bank Otkritie Fin. Corp., No. 22-mc-50, 2022 WL 2384169, at *3 (S.D.N.Y. July 1, 2022); In re Application of Hornbeam Corp., No. 14-MC-424, 2014 WL 8775453, at *1, 5 (S.D.N.Y. Dec. 24, 2014))) According to Petitioner, "Cargill's only argument that the documents [sought] lack 'probative value' and are unduly burdensome is [premised on the notion] that [National Bank Trust] cannot or will not actually initiate BVI proceedings." (National Bank Trust Opp. to Cargill Mot. (Dkt. No. 14) at 13 (citing Cargill Br. (Dkt. No. 2) at 21))

Finally, as to intrusiveness, National Bank Trust argues that the fact that it "is majority owned by the Central Bank of Russia" "is not a valid 'basis to deny relief to which [it] would otherwise be entitled.'" (Id. at 13 (quoting In re Nat'l Bank Trust, No. CV 3:20-mc-85 (CSH), 2023 WL 2386392, at *11 (D. Conn. Mar. 7, 2023)))

Cargill and the Dreyfus Entities assert, however, that the subpoenas Petitioners issued to the seven New York banks seek

> "copies of any and all orders, instructions, or wire transfers, where the paying or receiving party was [one of the eight identified Conduit Companies] in an amount equal to or exceeding $50,000 where [the bank] acted as either the direct transfer bank or as the intermediary or correspondent bank, from June 1, 2013, to September 30, 2017."

(Cargill Br. (Dkt. No. 2) at 20-21 (quoting Stein Decl., Ex. 25 (National Bank Trust Subpoena) (Dkt. No. 4-25))); see also Dec. 17, 2025 Dreyfus Ltr. (Dkt. No. 58) at 3) According to Cargill and the Dreyfus Entities, these subpoenas are "unimaginably intrusive," because the documents sought "are highly proprietary financial records of multiple US companies, all of which will ultimately be destined for Russia." (Cargill Br. (Dkt. No. 2) at 20-21; Dec. 17, 2025 Dreyfus Ltr.

37

(Dkt. No. 58) at 3)  Cargill further argues that "the requests are clearly an attempt by [National Bank Trust] to engage in a 'fishing expedition,'" (id. at 21 (quoting In re Harbour Victoria Inv. Holdings Ltd., 2015 WL 4040420, at *9 (S.D.N.Y. June 29, 2015))), because National Bank Trust has stated that it "will attempt to use the subpoenaed documents 'to identify the scope of the [s]cheme as well as potential other participants.'" (Id. at 21-22 (quoting Stein Decl., Ex. 3 (National Bank Trust Br.) (Dkt. No. 4-3) at 11))[14]  According to Cargill, using documents obtained pursuant to Section 1782 to "identify the scope of [an alleged fraud] [s]cheme" and to identify "potential other participants [in that fraud scheme]" is "impermissible":

> Section 1782's purpose is to permit relevant discovery in reasonably contemplated foreign proceedings.  [National Bank Trust], however, seeks to pervert that valid purpose by using § 1782 as a means to peruse a complete list of Cargill's counterparties, business partners, and clients – entities that are wholly unrelated to the fraud it alleges – in the hopes of finding additional targets for its aspirational, futile litigation.

(Id. at 22)[15]

---

[14] Petitioner stated in its ex parte Section 1782 petition "that it expected to use the subpoenaed documents 'to identify the scope of the [s]cheme as well as potential other participants.'" (Id. (quoting Stein Decl., Ex. 3 (National Bank Trust Br.) (Dkt. No. 4-3) at 11); see also 23 Misc. 6, National Bank Trust Br. (Dkt. No. 2) at 11)  National Bank Trust now states that this statement was intended to convey

> that the requested documents will help develop the factual record concerning the fraudulent scheme that forms the basis for the BVI proceedings by identifying what happened to the misappropriated funds.  National Bank Trust also recognizes that the requested documents may identify additional, unknown parties that were involved in the same fraudulent scheme, in which case those parties could be joined to the extant BVI proceedings.

(National Bank Trust Opp. to Cargill Mot. (Dkt. No. 14) at 13-14)

[15] Cargill also argues that Petitioner's request for these banking records is made in bad faith, because National Bank Trust "has no ability, or intent, to ever bring [a foreign court proceeding]." (Cargill Br. (Dkt. No. 2) at 21; see also id. ("The extensive scope and invasive nature of [National Bank Trust's] request[s] should be considered in light of the non-existent probative value of the documents it will receive," because National Bank Trust "cannot bring the claims identified in its application in a BVI proceeding," and thus the "documents [sought by

"Bank records . . . are[, of course,] routinely sought and produced via § 1782 petitions," In re Hellard, No. 121MC00864GHWKHP, 2022 WL 656792, at *2 (S.D.N.Y. Mar. 4, 2022) (citing In re Application of Hornbeam Corp., 2014 WL 8775453, at *5), and the subpoenas at issue here are tailored to seek information about only (1) certain transactions over a

---

[National Bank Trust] cannot be of any service to [National Bank Trust]. . . .") (internal quotation marks omitted))  As discussed above, however, Petitioner did in fact bring the BVI action it referenced in its original Section 1782 ex parte petition, and that action has been pending in the BVI for the past three years.  Accordingly, Cargill's bad faith arguments have proven to have no merit.

And to the extent that Cargill contends that Petitioner's subpoenas should be quashed merely because Petitioner is "an entity that is demonstrably controlled by Russia's Central Bank" (see Cargill Br. (Dkt. No. 2) at 21), it has provided no case support for that proposition.  By contrast, Petitioner has cited multiple cases from this Circuit in which courts have rejected similar arguments, including as to Petitioner National Bank Trust.  (See National Bank Trust Opp. to Cargill Mot. (Dkt. No. 14) at 10 (citing In re Nat'l Bank Tr., No. CV 3:20-MC-85 (CSH), 2023 WL 2386392, at *10-11 (D. Conn. Mar. 7, 2023); In re Application of PJSC Nat'l Bank Tr., No. 21-MC-00867 (PKC), 2022 WL 3925737, at *1 (S.D.N.Y. Aug. 31, 2022)))

In In re Application of PJSC Nat'l Bank Tr., for example, the court "permit[ed] [National Bank Trust] to conduct discovery in aid of litigation in Cyprus," despite the fact that "the EU subsequently sanctioned [National Bank Trust], [and even though] the foreign policy of the United States . . . condemns the actions of the country in which [National Bank Trust] is organized."  In re Application of PJSC Nat'l Bank Tr., 2022 WL 3925737, at *1.  And in In re Nat'l Bank Tr., which also concerned a Section 1782 petition filed by National Bank Trust, the court explained that, "[i]n contrast to cases involving discovery or evidentiary doctrines, district courts have on multiple occasions rejected arguments that they should deny discovery [under Section 1782] merely because U.S. foreign policy disfavors the recipient. . . . [I]t is simply not the place of this Court to engage in foreign policy.  This Court's ambit is to apply the law as laid out in the Constitution, federal statutes, and federal regulations to the cases that come before it; it is not to divine from such documents a general U.S. policy disfavoring a foreign entity, and on that basis to deny relief to which that entity would otherwise be entitled."  In re Nat'l Bank Tr., 2023 WL 2386392, at *9-10 (citing In re Application of PJSC Nat'l Bank Tr., 2022 WL 3925737, at *1; Deposit Ins. Agency v. Leontiev, No. 17-MC-00414 (GBD)(SN), 2018 WL 3536083, at *5-6 (S.D.N.Y. July 23, 2018)).  Indeed, in In re Nat'l Bank Tr. the court concluded "that U.S. sanctions on the Central Bank and other Russian entities neither directly bar the relief [National Bank Trust] seeks nor constitute sufficient discretionary grounds to deny [National Bank Trust's] application."  Id. at *11.  This Court agrees that a party opposing a Section 1782 application on grounds of burden or intrusiveness cannot rely simply on the fact that a Russian state-controlled entity is seeking the financial records at issue.

particular dollar threshold; (2) involving eight identified Conduit Companies; (3) over a four-year period. (See 23 Misc. 6, Michael Decl., Ex. 1 (Proposed Deutsche Bank Trust Company Americas Subpoena) (Dkt. No. 4-1); 23 Misc. 6, Michael Decl., Ex. 2 (Proposed Bank of New York Mellon Subpoena) (Dkt. No. 4-2); 23 Misc. 6, Michael Decl., Ex. 3 (Proposed Standard Chartered Bank Subpoena) (Dkt. No. 4-3); 23 Misc. 6, Michael Decl., Ex. 4 (Proposed UBS AG Subpoena) (Dkt. No. 4-4); 23 Misc. 6, Michael Decl., Ex. 5 (Proposed Societe Generale USA Subpoena) (Dkt. No. 4-5); 23 Misc. 6, Michael Decl., Ex. 6 (Proposed JP Morgan Chase Bank NA Subpoena) (Dkt. No. 4-6); 23 Misc. 6, Michael Decl., Ex. 7 (Proposed Citibank NA Subpoena) (Dkt. No. 4-7))

Courts in this District have found similar subpoenas sufficiently narrowly tailored for purposes of the fourth Intel factor. See, e.g., In re Pub. Joint-Stock Co. Bank Otkritie Fin. Corp., No. 22-MC-50 (VSB), 2023 WL 4928227, at *4 (S.D.N.Y. Aug. 2, 2023) ("Petitioners' proposed order will authorize them to serve a subpoena on Commerzbank for '[c]opies of any and all orders, instructions, or wire transfers, where the paying or receiving party was Coniston Management Limited, in an amount equal to or exceeding $50,000 where you acted as either the direct transfer bank or as the intermediary or correspondent bank, from January 1, 2017 to the present.' I find the proposed subpoena to be narrowly tailored to the information Petitioners are seeking, and not unduly burdensome or intrusive, as the sought materials are routinely produced by banks to satisfy discovery requests.") (internal citation omitted) (citing In re Rodriguez Guillen, 20-MC-102 (ALC), 2020 WL 3497002, at *3 (S.D.N.Y. June 29, 2020) ("noting that a third-party bank 'should be able to search for and produce . . . records of wire transfers without significant burden'"))). The Court concludes that Cargill and the Dreyfus Entities have not

40

demonstrated that the subpoenas are unduly burdensome or intrusive, much less "unimaginably intrusive." (Cargill Br. (Dkt. No. 2) at 21)

Cargill also complains, however, that Petitioner is engaged in a "fishing expedition," because it has stated that it intends to use the subpoenaed documents "to identify the scope of the [alleged fraud] [s]cheme as well as potential other participants." (Cargill Br. (Dkt. No. 2) at 21-22) But Petitioner initiated proceedings against Cargill, the Dreyfus Entities, and other entities in the BVI in 2023. (See Particulars of Claim (Dkt. No. 70-2)) Accordingly, this is not – as Cargill contends – a case in which "Petitioner must 'rely upon the requested [Section 1782] discovery "to assess whether to initiate [contemplated foreign] actions."'" In re Novalpina Cap. Partners I GP S.À.R.L., No. 23 MISC. 25 (PGG), 2025 WL 1160854, at *21 (S.D.N.Y. Apr. 21, 2025) (quoting In re Kuwait Ports Auth., No. 1:20-MC-00046-ALC, 2021 WL 5909999, at *8 (S.D.N.Y. Dec. 13, 2021) (quoting In re Sargeant, 278 F.Supp.3d 814, 823-24 (S.D.N.Y. Oct. 10, 2017))) Accordingly, National Bank Trust's discovery requests do not constitute an impermissible "fishing expedition." See In re Bourlakova, 2024 WL 4839047, at *3 (concluding that discovery sought was "for use in a foreign proceeding" under Section 1782; "[a]lthough 'courts have denied section 1782 applications when the discovery sought is a "fishing expedition" for anticipated use in "nonexistent, purely hypothetical proceedings,"' the U.K. Proceeding is pending, not hypothetical" (quoting In re Arida, LLC, No. 19-MC-522, 2020 WL 7496355, at *7 (S.D.N.Y. Dec. 21, 2020) (internal citations omitted))).

In sum, Cargill has not shown that the discovery sought by National Bank Trust is unduly intrusive or burdensome.

## CONCLUSION

For the reasons stated above, the Dreyfus Entities' motion to intervene is granted (Dkt. No. 34), and the motions to quash – or in the alternative for a stay of discovery – filed by

41

Cargill and the Dreyfus Entities (Dkt. Nos. 1, 34) are denied.  The Dreyfus Entities' motion to stay compliance with National Bank Trust's subpoenas pending resolution of their motion to quash (Dkt. No. 34) is denied as moot.  Cargill's motion for oral argument on its motion to quash (Dkt. No. 21), and National Bank Trust's motion for a status conference (Dkt. No. 50) are denied as moot.  The Respondent Banks will produce the discovery authorized in this Opinion by **May 1, 2026.**

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 1, 21, 34, 50) and to close this case.

Dated: New York, New York
April 17, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge